**WARRINER HERMETICS, INC., and Warriner Parts, Inc., Plaintiffs-Appellants,**

v.

**COPELAND REFRIGERATION CORPORATION, Defendant-Appellee.**

**No. 30854.**

United States Court of Appeals, Fifth Circuit.

July 3, 1972.

Rehearing Denied July 25, 1972.

Winfred Hooper, Jr., David F. Chappell, Fort Worth, Tex., John G. Weinmann, Phelps, Dunbar, Marks, Claverie & Sims, Philip de V. Claverie, New Orleans, La., Hooper, Kerry & Chappell, Fort Worth, Tex., for plaintiffs-appellants.

Patrick E. Higginbotham, Dallas, Tex., James C. McKay, George R. Poehner, Harvey M. Applebaum, John H. Schafer, III, Washington, D. C., Coke & Coke, Dallas, Tex., Covington & Burling, Washington, D. C., for defendant-appellee.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judge:

SIMPSON, Circuit Judge:

Warriner Hermetics, Inc. (Hermetics), and Warriner Parts, Inc. (Parts), Texas corporations headquartered in Fort Worth, brought suit for damages and injunctive relief against the Copeland Refrigeration Corporation (Copeland), a Michigan corporation with its principal place of business in Sidney, Ohio alleging violations of the Sherman Act, Title 15, U.S.C., Sections 1 and 2,[1]

1. Title 15, U.S.C., § 1:

"Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: Provided, That nothing contained in sections 1-7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when

contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: Provided further, That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers,

the Clayton Act, Title 15, U.S.C., Section 14,[2] and the Robinson-Patman Amendment to the Clayton Act, Title 15, U.S.C., Section 13.[3] Following a jury verdict for Copeland, the district court denied the plaintiffs' motions for judgment notwithstanding the verdict and for new trial, entered judgment for Copeland on the damages issue, and denied injunctive relief. Because the trial judge failed to pose proper interrogatories to the jury with respect to the plaintiffs' theory of Copeland's alleged *per se* violations of the Sherman Act, we reverse and remand for a new trial.

## COPELAND REFRIGERATION CORPORATION

Copeland was founded in 1918 in Flint, Michigan, by Edward Copeland, the designer and builder of the world's first mechanical refrigerator. The corporation went into receivership in 1932, at which time Frank J. Gleason, Sr., and three others acquired two-thirds of the outstanding stock. When the Gleason group gained control of Copeland, it was manufacturing refrigerators and compressors.

The compressor plays a pivotal role in any mechanical refrigeration system. During the refrigeration cycle, the refrigerant is transformed from a gas to a liquid by the compressing action of the piston. The refrigerant is then permitted to escape at a controlled rate through a valve, at which time it resumes its gaseous state by absorbing heat from its environment. The process of heat absorption makes it possible for refrigeration to occur.

All the compressors of the early 1930's had an external power source, ordinarily a gasoline or electric motor, connected to the unit by means of a drive belt. These bulky units suffered from belt wear as well as wearing of the pulley shafts, with consequent escape of the refrigerant, and required that the owner exercise diligence in maintaining the units. Copeland's new management solved these problems by developing a

or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Title 15, U.S.C., § 2:
"Monopolizing trade a misdemeanor; penalty
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

2. Title 15, U.S.C., § 14:
"Sale, etc., on agreement not to use goods of competitor
It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding *may be to substantially lessen competition or tend to create a monopoly in any line of commerce.*

3. Contentions as to Robinson-Patman violations received a very minor emphasis below; they are involved only slightly and peripherally in our treatment of this appeal. In the interest of space we refrain from setting forth the text of the Robinson-Patman Amendment, Title 15, U.S.C. § 13.

hermetically sealed compressor, styled the "Copelametic", which was accessible to a workman using ordinary tools. These new compressors contained the power source within the compressor itself, with the rotor of the electric motor and the crankshaft constituting the same shaft. The Copelametic was and still is constructed of cast iron. A standard ten horsepower unit weighs approximately four hundred pounds. Units range in size from fractional to seventy horsepower.

In 1946 Copeland discontinued production of complete refrigerators and has since concentrated on manufacturing compressors, condensing units and their parts. Prior to that time, Copeland adopted two marketing policies which are still in effect: (1) Copeland sells its products only to original equipment manufacturers (OEM's), such as General Electric, Chrysler Airtemp, Carrier, Lennox, etc.; and (2) certain compressor replacement parts are sold in assemblies only and others are sold not at all.

Copeland warrants its compressors to be free of defects for one year. The OEM's customarily warrant their end products, containing Copeland compressors, for five year periods. To facilitate the replacement of failed compressors, Copeland developed a nation-wide network of more than two hundred franchised wholesalers. These wholesalers carry complete inventories of compressors and are able to replace failed compressors installed in nearby retail establishments. Minimum inventories are maintained by the authorized (franchised) wholesalers with the financial assistance of Copeland.

Beginning in 1958, Copeland began to develop a network of licensees authorized to engage in the rebuilding of failed compressors, an activity previously performed only by Copeland itself. A license agreement was executed in 1958 between Copeland and Hermetic Refrigeration Company of Phoenix, Arizona. Two years later, a similar agreement was consummated with Our-Way, Inc., a Georgia corporation. That same year,

1960, following an abortive four-month relationship with the appellant Hermetics, Copeland granted a license to Aircondex, Inc., a rebuilder in the Dallas-Fort Worth area. Each franchised rebuilder operates under similar conditions. The rebuilder receives failed compressors from, and returns them rebuilt to, the Copeland wholesalers for resale. These rebuilt compressors bear the Copeland trade name and the same warranty as new compressors. Copeland sells genuine Copeland parts to the rebuilders for use in rebuilding at a discount of sixty percent (60%) from a suggested retail price, resulting in a lower price than that at which Copeland sells parts to its authorized wholesalers for resale. The rebuilders pay no royalties or other fees for their licenses. Instead, they are obligated to rebuild compressors that are still covered by the one-year Copeland warranty, billing Copeland only for the parts used and the freight to and from the wholesale customer.

In 1963, Copeland introduced a new high-speed compressor for the air conditioning and heat pump markets called the "Copelaweld". This unit is similar in design to those manufactured and sold by Tecumseh Products Company of Tecumseh, Michigan. The Copelaweld was not rebuilt by any of the franchised rebuilders for Copeland until 1967 and Copeland has never sold Copelaweld parts for resale purposes.

It is undisputed that Copeland is the nation's largest producer of rebuilt commercial refrigeration compressors and parts. The plaintiffs endeavored to compete with Copeland in this line of commerce, but, for the most part, were unsuccessful.

## THE PLAINTIFF-APPELLANT WARRINER COMPANIES

The plaintiff companies were founded in the late 1950's by Thomas Warriner. Plaintiff-appellant Hermetics is engaged in rebuilding compressors and plaintiff-appellant Parts manufactures and distributes compressor replacement parts.

Warriner's companies initially concentrated on the rebuilding of Tecumseh compressors and performed rebuilding services for several OEM's. After the abortive relationship with Copeland, supra, the plaintiffs-appellants began rebuilding Copeland units for the Mathes Corporation, an OEM. They endeavored to increase their business in both Tecumseh and Copeland compressors through the engagement of David Ruthstrom as exclusive sales representative. His assignment was to promote the sale of plaintiffs' rebuilt compressors through wholesalers but he was unsuccessful in this regard. In 1963 Hermetics discontinued the business of rebuilding Copelametics. Hermetics was further damaged when both Tecumseh and Copeland began to produce two-pole, high speed models in 1963 and 1966, respectively.

In late 1963 or early 1964, plaintiffs again attempted to compete with Copeland in the rebuilding field. In 1967, Copeland directed its Dallas franchised rebuilder, Aircondex, to lower its price to meet competition from the plaintiffs without directing its other rebuilders to do the same.

During the period 1963 through 1967, Hermetics attempted to sell its rebuilt Coplametics to Thermal Supply, Copeland's franchised wholesaler in Houston. After Thermal Supply issued purchase orders, but before they were filled, Thermal cancelled. This cancellation extended to one of its stores which was not an authorized Copeland location.

### THE COMPLAINT

The basic premise of the plaintiffs' complaint was an assertion that competition was possible with Copeland only through the franchised wholesalers and rebuilders of the Copeland system. If the plaintiffs were prevented from selling rebuilt Copeland compressors and from selling non-Copeland spare parts to the wholesalers and rebuilders, respectively, then, according to the plaintiffs, they would be unable to engage in the line of commerce. The complaint alleged the illegality of Copeland's franchising policies in the following manner:

(A) Copeland prohibited its franchised wholesalers and rebuilders, all independently owned businesses, from purchasing plaintiffs' products and Copeland tied certain parts to the purchase of kits upon sale to the franchised wholesalers. These practices were alleged to be in violation of the Clayton Act.

(B) Copeland and its franchisees engaged in the following conspiracies: (1) Copeland controlled the disposition of rebuilt compressors and spare parts after sale and after title passed to Copeland's franchised wholesalers and rebuilders; (2) Copeland tied the purchase of rebuilt compressors, parts and/or rebuilding services to the Copeland franchise; (3) Copeland and its franchisees engaged in concerted refusals to deal (boycotts) directed against the plaintiffs; and (4) Copeland fixed the prices at which its wholesalers and rebuilders sold rebuilt compressors and parts. These practices were alleged to be in violation of Section 1 of the Sherman Act.

(C) Copeland monopolized, or attempted to monopolize, the commerical refrigeration line of compressors and compressor parts. These practices were alleged to be in violation of Section 2 of the Sherman Act.

(D) Copeland directed its Dallas rebuilder, Aircondex, to lower its exchange price to Copeland wholesalers in the southwest but did not issue such a directive to its other rebuilders. In addition, Copeland granted discounts to its franchised wholesalers for volume sales. Each of these practices was alleged to have violated the Robinson-Patman Amendment.

These allegations of Copeland's antitrust law violations were coupled with an assertion that the plaintiffs suffered severe economic damages as a proximate result thereof. Relief was sought injunctively and in the form of treble damages.

## THE COPELAND DEFENSE

Copeland responded to the plaintiffs' allegations on several levels. It endeavored to establish thay any reverses suffered by the plaintiffs were caused solely by the business and technical ineptitude of the plaintiffs themselves. Copeland also challenged the accuracy of the plaintiffs' portrayal of Copeland's supervisory policies over the Copeland franchisees. Finally, conceding for purposes of argument the accuracy of plaintiffs' description of its franchising practices, Copeland contended that these practices did not violate the antitrust laws.

Because we focus our attention in this opinion upon the doctrinal accuracy of the trial judge's special interrogatories to the jury, we outline here Copeland's legal defense of its franchising practices. Copeland, in the district court and in this Court, has taken the following positions:

(C) Any condition which Copeland may have imposed upon its franchisees that they not purchase products manufactured by Copeland's competitors constituted "exclusive dealing" arrangements measurable under the Clayton Act's tests of reasonableness and anticompetitive effect.

(B) Agreements pursuant to which the wholesalers undertook to purchase only from Copeland or its authorized rebuilders constituted ordinary requirements contracts, measurable under Clayton Act standards. The same standard was to be applied to similar conditions placed upon Copeland's franchised rebuilders.

(C) There was no basis upon which a jury could conclude that the Copeland franchise had any independent economic value to which could be tied the purchase of Copeland's products.

## SPECIAL ISSUE NUMBER 3(c)

At the conclusion of the trial, special issues were submitted to the jury. Special Issue Number 3(c) dealt with the plaintiffs' allegations of Copeland's unlawful tying practices with respect to its franchisees:

> "Do you find from a preponderance of the evidence that defendant Copeland entered into any one or more of the following alleged contracts, combinations or conspiracies with non-defendant alleged co-conspirators hereinbefore named as Copeland 'authorized' wholesalers and as Copeland 'authorized' rebuilders; that such contracts, combinations or conspiracies constituted an unreasonable restraint of trade; and that either or both plaintiffs were injured in their business or property as a direct and proximate result thereof, viz.:
>
> (a)   \*   \*   \*
>
> (b)   \*   \*   \*
>
> (c)   with one or more of such Copeland 'authorized' wholesalers or rebuilders in furtherance of which defendant, Copeland, sold or fixed a price charged on new or rebuilt Copeland compressors or parts on the condition, agreement or understanding that such 'authorized' wholesalers or rebuilders not use or deal in the products of the plaintiffs, where the effect of such sale, condition, agreement or understanding may be substantially to lessen competition or tend to create a monopoly in any line of commerce you have found?"

Appellants contend that this special issue, which the jury answered in the negative, erroneously submitted the "tying" question to the jury on a theory of "reasonableness" rather than on a "per se" illegality theory. Copeland argues that Special Issue Number 3(c) was an accurate statement of the law because its franchising practices fall outside the coverage of the "tie-in" doctrine as articulated by the U.S. Supreme Court.

## THE DEVELOPMENT OF THE PER SE ILLEGALITY DOCTRINE

Mr. Justice Black, speaking for the Court in Northern Pacific Railway Company v. United States, 1958, 356 U.S. 1,

78 S.Ct. 514, 2 L.Ed.2d 545, discussed the origins of the doctrine of a *per se* Sherman Act violation in the following manner:

"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits 'Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States.' Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683.

"However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129; division of markets, United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44, L.Ed. 136; group boycotts, Fashion Originators' Guild of America v. Federal Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20." 356 U.S. at 4–5, 78 S.Ct. at 517–518, 2 L.Ed.2d at 549–550.

## THE EVOLUTION OF THE TIE-IN CONCEPT

International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, involved a government antitrust action to enjoin the International Salt Company from enforcing provisions of the leases of its patented machines requiring lessees to use therein only the defendant's salt and salt products. The district court granted judgment on the pleadings to the United States and the Supreme Court affirmed on direct appeal. Mr. Justice Jackson was the Court's spokesman. The inter-relationship between the defendant's patents and antitrust statutes was there treated in this fashion:

"The appellant's patents confer a limited monopoly of the invention they reward. From them appellant derives a right to restrain others from making, vending or using the patented machines. But the patents confer no right to restrain use of, or trade in, unpatented salt. By contracting to close this market for salt against competition, International has engaged in a restraint of trade for which its patents afford no immunity from the

anti-trust laws." 332 U.S. at 395–396, 68 S.Ct. at 15, 92 L.Ed. at 25–26.

The Court went on to hold that while it is unreasonable, *per se*, to foreclose competitors from any substantial market, a lessor of machinery "may impose on a lessee reasonable restrictions designed in good faith to minimize maintenance burdens and to assure satisfactory operation." 332 U.S. at 397, 68 S.Ct. at 16, 92 L.Ed. at 27. Mr. Justice Jackson's opinion made it clear, however, that while such restrictions could not be couched in terms of a particular vendor they could nevertheless set quality specifications appropriate to their intended purposes. 332 U.S. at 397–398, 68 S.Ct. at 16, 92 L.Ed. at 27.

In Standard Oil Co. of California and Standard Stations, Inc. v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 96 L.Ed. 1371, the Court dealt primarily with the legality under section 3 of the Clayton Act of exclusive supply contracts between the defendants and their independent dealers. The following discussion of "tying" agreements in that opinion has been cited as the origin of the defense of "justification":

> "Tying agreements serve hardly any purpose beyond the suppresssion of competition. The justification most often advanced in their defense—the protection of the good will of the manufacturer of the tying device—fails in the usual situation because specification of the type and quality of the product to be used in connection with the tying device is protection enough. If the manufacturer's brand of the tied product is in fact superior to that of competitors, the buyer will presumably choose it anyway. The only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied. In the usual case only the prospect of reducing competition would persuade a seller to adopt such a contract and only his control of the supply of the tying device, whether

conferred by patent monopoly or otherwise obtained, could induce a buyer to enter one. . . . The existence of market control of the tying device, therefore, affords a strong foundation for the presumption that it has been or probably will be used to limit competition in the tied product also." 337 U.S. at 305–306, 69 S.Ct. at 1058, 93 L.Ed. at 1382.

In Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277, the United States brought a civil action against a single publisher of morning and evening newspapers in New Orleans for Sherman Act violations because the publisher's advertising contracts required that advertisers buy space in both newspapers. Advertisements were not accepted for one paper. The Supreme Court found no *per se* Sherman Act violations because both newspapers were found to sell the same product to advertisers, to wit: readership. Accordingly the Court found that no tie-in existed and the *per se* rule was inapplicable.

In Northern Pacific Railway Company v. United States, supra, the government had brought an anti-trust suit below against the railroad and its lands subsidiary to have certain contractual provisions contained in deeds and leases executed by the subsidiary declared illegal. The Supreme Court held that *per se* violations of the Sherman Act occurred where the railroad and the subsidiary deeded and leased the railroad's land under instruments containing clauses requiring the grantees and lessees to ship products obtained from the use of the land over Northern Pacific routes unless the rates or services of competing carriers were more favorable. In effect, real property was deemed in and of itself so unique as to constitute a tying product for purposes of the Sherman Act.

The Supreme Court in United States v. Loew's, Inc., 1962, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11, citing its 1948 decision in United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92

L.Ed. 1260, held that block booking of copyrighted feature motion pictures for television exhibition was in violation of the Sherman Act as a *per se* illegal tying arrangement. The existence of a copyright was deemed strongly persuasive evidence of significant market power in the tied products: the feature films to which were tied much less desirable ones.

Fortner Enterprises, Inc. v. United States Steel Corporation, 1969, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495, is generally regarded as a notable expansion of the applicability of the *per se* illegality doctrine with respect to tying arrangements. That case concerned a private civil antitrust action by Fortner, a housing developer, against the manufacturer of pre-fabricated houses and its wholly owned subsidiary. Fortner charged that a *per se* Sherman Act violation occurred in a tying arrangement whereby loans by the subsidiary to Fortner for the purchase and development of land were conditioned upon Fortner's agreeing to erect a pre-fabricated house manufactured by the parent on each of the lots purchased with the loan proceeds. The district court granted summary judgment for the defendants and the court of appeals affirmed. The Supreme Court reversed, holding that the amounts of sales allegedly foreclosed by the tying arrangements, totaling almost $4,000,000 in 1960, more than $2,800,000 in 1961, and almost $2,300,000 in 1962, were not insubstantial for purposes of determining whether the tying arrangement was illegal and that a factual issue was presented as to whether the subsidiary had market power over borrowers in the credit market. Particularly relevant to the issue before us in this case, Mr. Justice Black's opinion for the Court in *Fortner Enterprises* observed:

> "There is, at the outset of every tie-in case, including the familiar cases involving physical goods, the problem of determining whether two separate products are in fact involved." 394 U.S. at 507, 89 S.Ct. at 1260, 22 L.Ed.2d at 507.

## THE TREATMENT OF EXCLUSIVE DEALING REQUIREMENTS CONTRACTS

In Standard Oil Co. of California and Standard Stations, Inc. v. United States, supra, the United States sought a declaratory judgment holding that exclusive supply contracts between the defendants and independent dealers in petroleum products and automobile accessories were illegal. Injunctive relief was also asked. Mr. Justice Frankfurter, as the Court's organ, used this language in affirming a judgment below for the plaintiff United States:

> "Requirements contracts, on the other hand, may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public. In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, requirements contracts may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and—of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified—offer the possibility of a predictable market. . . . . Since these advantages of requirements contracts may often be sufficient to account for their use, the coverage by such contracts of a substantial amount of business affords a weaker basis for the inference that competition may be lessened than would similar coverage by tying clauses, especially where use of the latter is combined with market control of the tying device. A patent, moreover, although in fact there may be many competing substitutes for the patented article, is at least prima facie evidence of such control. . . ." 337 U.S. at 306–307, 69 S.Ct. at 1058–1059, 93 L.Ed. at 1382–1383.

The Supreme Court's sympathetic approach to *non-tying* contractual arrangements was exemplified in its decision in Tampa Electric Company v. Nashville Coal Company, 1961, 365 U.S. 320, 81 S. Ct. 623, 5 L.Ed.2d 580. Tampa Electric Company brought suit for a declaratory judgment, declaring the validity of its fuel requirements contract with the defendant coal company and for enforcement of the contract according to its terms. The Supreme Court held that the contract, which covered all coal to be used by the utility for twenty years and which pre-empted less than one percent of the total relevant coal market, did not substantially foreclose competition in that market. In addition, the Court determined that the contract did not constitute a significant limitation of opportunity for other traders to enter into or remain in the relevant market, so as to violate Section 3 of the Clayton Act, Title 15, U.S.C., Section 14. 365 U.S. at 327, 81 S.Ct. at 628, 629, 5 L.Ed.2d at 587.

Much of the *Tampa Electric* opinion was taken up in a delineation of the relevant coal market. The Court found that the market extended to at least seven states and not to the much more restricted area cited by the defendant coal company. Mr. Justice Clark's opinion asserted:

"In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section [Section 3, Clayton Act] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." 365 U.S. at 327, 81 S.Ct. at 628, 5 L.Ed.2d at 587–588.

### THE COURT EXAMINES FRANCHISING

The Supreme Court took the opportunity to study franchising agreements in United States v. Arnold, Schwinn & Co., 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L. Ed.2d 1249. The United States brought a civil antitrust action under the Sherman Act against a manufacturer of bicycles, Arnold, Schwinn & Co., an association of Schwinn distributors, and a Schwinn distributor, asking for a declaratory judgment establishing the invalidity of the manufacturer's franchising system for the distribution of its products. Schwinn distributed its bicycles by means of direct shipments to franchised retailers. These retailers were forbidden by their franchise agreement to sell Schwinn bicycles to anyone other than ultimate consumers. The manufacturer also distributed its products to franchised distributors and barred these distributors by contract from reselling the bicycles to anyone outside their assigned territories. The Court, speaking through Mr. Justice Fortas, condemned these practices as *per se* Sherman Act violations:

"As the District Court held, where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. . . . Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale. To permit this would sanction franchising and confinement of distribution as the ordinary instead of the unusual method which may be permissible in an appropriate and impelling competitive setting, since most merchandise is distributed by means of purchase and sale. On the other hand, as indicated in *White Motor* [Co. v. United States,

372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738], we are not prepared to introduce the inflexibility which a *per se* rule might bring if it were applied to prohibit all vertical restrictions of territory and all franchising, in the sense of designating specified distributors and retailers as the chosen instruments through which the manufacturer, retaining ownership of the goods, will distribute them to the public. Such a rule might severely hamper smaller enterprises resorting to reasonable methods of meeting the competition of giants and of merchandising through independent dealers, and it might sharply accelerate the trend towards vertical integration of the distribution process. But to allow this freedom where the manufacturer has parted with dominion over the goods—the usual marketing situation —would violate the ancient rule against restraints on alienation and open the door to exclusivity of outlets and limitation of territory further than prudence permits." 388 U.S. at 379–380, 87 S.Ct. 1865–1866, 18 L.Ed. 2d at 1260–1261.

### TRADEMARK FRANCHISING: TIE-IN OR EXCLUSIVE DEALING?

In evaluating the correctness—as accurately reflecting the controlling legal precedents—of the trial judge's Special Issue Number 3(c) we must consider two questions:

(a) Did Special Issue Number 3(c) require the jury to assess Copeland's conduct on a standard of "reasonableness" and "anticompetitive effect"?

(b) If the answer to (a) is "Yes", should Copeland's franchising practices be measured against the criteria applicable to tying arrangements or against those applicable to exclusive dealing contracts?

■■ We think that (a) must be resolved in the affirmative. The trial judge asked the jury to determine if the contracts, combinations or conspiracies alleged by the plaintiffs "constituted an unreasonable restraint of trade". In addition, the jury was asked to consider if the "effect of such sale, condition, agreement, or understanding may be substantially to lessen competition or tend to create a monopoly in any line of commerce . . . ." Clearly, these criteria are not those envisioned by the Supreme Court in its decisions dealing with *per se* Sherman Act violations. This issue disposed of, we now proceed to the critical problem before us: do Copeland's franchising practices fall within the category of tying arrangements (subject to the *per se* doctrine) or are they to be classified as exclusive dealing or requirements contracts (subject to the more relaxed standards of Section 3 of the Clayton Act)? For the reasons given below, we believe that Copeland's franchising practices should be characterized, for antitrust law purposes, as tying arrangements. Consequently, the district court's Special Issue Number 3(c) was prejudicially erroneous.

Two courts of appeals have considered problems similar to the one now before us. The Second Circuit ruled in Susser v. Carvel Corporation, 1964, 332 F.2d 505, cert. dismissed, 1965, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284, that the franchising practices of the defendant were not violative of the antitrust laws. The Ninth Circuit, in Siegel v. Chicken Delight, Inc., 1971, 448 F.2d 43, cert. denied February 28, 1972, 405 U.S. 955, 92 S.Ct. 1172 and 1173, 31 L.Ed.2d 232, found that the defendant's contractual requirements with respect to its franchisees violated the Sherman Act. Analysis of these two decisions is most helpful in our resolution of this case.

We go first to the Second Circuit case, *Carvel*. A number of Carvel Corporation franchisees brought actions, tried together below and consolidated for appeal, against the franchisor, a manufacturer of dairy and primarily soft ice cream products, its subsidiary organizations, officers and attorneys and a number of its suppliers, alleging violations of the Sherman Act. The franchisees

charged violations in at least two respects: every Carvel franchised dealer was permitted to sell only Carvel products and every Carvel dealer was required to purchase Carvel mix and other products solely from either the franchisor or designated suppliers. The complaint also charged the Carvel defendants with fraudulent misrepresentations in the negotiation of franchises. The district court, after trial on the issues of liability, dismissed most of the complaints[4], and the Second Circuit affirmed with the author of the opinion, Chief Judge Lumbard dissenting in part from the views of the majority, Judges Medina and Friendly.

Judge Lumbard undertook to state the distinction between a tying arrangement, on the one hand, and an exclusive dealing contract as applied to franchises on the other, as follows:

> "The requirement that the dealer sell solely Carvel products would, if taken alone, present an example of an exclusive dealing arrangement; the requirement that the dealer purchase not only Carvel mix but also certain other products would, if taken alone, present an example of a tying arrangement." 332 F.2d at 511.

Citing *Tampa Electric Company* the court determined that the franchisor was justified in requiring its franchisees to refrain from dealing in products other than those approved by Carvel and that this requirement did not violate the Sherman Act. Again speaking for the court, Judge Lumbard decided that the antitrust laws were not offended by agreements between the franchisor and its suppliers prohibiting the suppliers from dealing directly with the franchisees. The franchisor was held not to be in competition with its own suppliers.

With unanimity to this point, the Second Circuit panel here parted company. Judge Lumbard, in dissent, urged the view that the requirement that the fran-

chisees purchase all their supplies from designated suppliers constituted a tie-in which *per se* violated the Sherman Act. In support of his position Judge Lumbard asserted that the existence of the Carvel trademark was itself evidence of sufficient market leverage to bring the *per se* concept into effect. Judge Lumbard urged further that Carvel in legal contemplation competed with other suppliers of component products and that Carvel's operations foreclosed potential competitors from dealings with the franchisees. A final argument by Judge Lumbard against the tie-in characterization was stated:

> "The second argument advanced in support of the proposition that the Carvel franchise does not embody a tying arrangement is that we are dealing not with a series of individual products tied together for purposes of sale, but rather with one unified product, that is the Carvel product which is ultimately consumed by the public. I do not agree. Carvel sells supplies as distinct items in large quantities— for example, ten gallons of mix, ten gallons of chocolate syrup, and so forth. Carvel itself purchases these supplies as distinct items from a wide variety of suppliers who in turn make individual deliveries to the franchise outlets. By their very nature it seems clear that there is no reason to treat these separate products as one unified product although to the ultimate consumer of an ice cream cone or a sundae they would seem to be one." 332 F.2d at 514.

Judge Friendly, joined by Judge Medina, found no Sherman Act violation in Carvel's requirement that its franchisees purchase all supplies through specified suppliers:

> "Our brother Lumbard thinks the first of the deficiencies in proof as to economic power was remedied by Carvel's license of a package of trademarks, design patents relating to the

---

4. Judge Dawson's district court opinion is reported as Susser v. Carvel Corporation, S.D.N.Y. 1962, 266 F.Supp. 636.

shape of the building etc., and a patented freezing and dispensing machine. We cannot agree. In the first place, the patented items cannot realistically be considered the 'tying product' or the focus of the arrangement. Whatever has been said about the evils of 'ties' to patented or copyrighted items is meaningful only in the situation where the desirability of the patented item is what motivates the purchaser to make further commitments or to give up some liberty of choice as to other products. . . .

In this case, the patented items appear to have been virtually without motivating significance in bringing about the agreement. The true tying item was rather the Carvel trademark, whose growing repute was intended to help the little band of Carvel dealers swim a bit faster than their numerous rivals up the highly competitive stream. There may of course, be cases where a trade-mark has acquired such prominence that the coupling of some further item to its license would constitute a *per se* violation; but such a trade-mark would satisfy the market dominance test of Times-Picayune and Northern Pacific. The figures show that Carvel is not such a mark." 332 F.2d at 519.

We turn our attention now to the Ninth Circuit decision, Siegel v. Chicken Delight, Inc., supra. This was an antitrust class action in which the franchisees of Chicken Delight sought treble damages for injuries resulting from claimed illegal restraints imposed by the defendant's standard form franchising agreements. These agreements required that the franchisees purchase certain essential cooking equipment, dry-mix food items and trade-mark bearing packaging exclusively from the defendant as a condition of obtaining the defendant's trade-mark license to operate home delivery and pick-up food stores. The district court [5] entered judgment for the plaintiffs and the Ninth Circuit af-

firmed in part and remanded for a new trial on certain fact issues as to damages. In so ruling, the Court of Appeals held that the defendant's contractual requirements constituted a tying arrangement in violation of Section 1 of the Sherman Act. The importance of that decision to the result we reach requires quotation from Judge Merrill's opinion for the Ninth Circuit at some length:

"Chicken Delight urges us to hold that its trade-mark and franchise licenses are not items separate and distinct from the packaging, mixes, and equipment, which it says are essential components of the franchise system. To treat the combined sale of all these items as a tie-in for antitrust purposes, Chicken Delight maintains, would be like applying the antitrust rules to the sale of a car with its tires or a left shoe with the right. Therefore, concludes Chicken Delight, the lawfulness of the arrangement should not be measured by the rules governing tie-ins. We disagree."

\*     \*     \*     \*     \*     \*

"The historical conception of a trade-mark as a strict emblem of source of the product to which it attaches has largely been abandoned. The burgeoning business of franchising has made trade-mark licensing a wide-spread commercial practice and has resulted in the development of a new rationale for trade-marks as representations of product quality. This is particularly true in the case of a franchise system set up not to distribute the trade-marked goods of the franchisor, but, as here, to conduct a certain business under a common trade-mark or trade name. Under such a type of franchise, the trade-mark simply reflects the goodwill and quality standards of the enterprise which it identifies. As long as the system of operation of the franchisees lives up to those quality standards and remains as represented by the mark so that the public is not misled, neither

5. Siegel v. Chicken Delight, Inc., N.D.Cal.1970, 311 F.Supp. 847, Chief Judge Harris.

the protection afforded the trade-mark by law nor the value of the trade-mark to the licensee depends upon the source of the components.

"This being so, it is apparent that the goodwill of the Chicken Delight trade-mark does not attach to the multitude of separate articles used in the operation of the licensed system or in the production of its end product. It is not what is used, but how it is used and what results that have given the system and its end product their entitlement to trade-mark protection. It is to the system and the end product that the public looks with the confidence that established goodwill has created.

"Thus, sale of a franchise license, with the attendant rights to operate a business in the prescribed manner and to benefit from the goodwill of the trade name, in no way requires the forced sale by the franchisor of some or all of the component articles. Just as the quality of a copyrighted creation cannot by a tie-in be appropriated by a creation to which the copyright does not relate, United States v. Paramount Pictures, Inc., 334 U.S. 131, 158, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), so here attempts by tie-in to extend the trade-mark protection to common articles (which the public does not and has no reason to connect with the trade-mark) simply because they are said to be essential to production of that which is the subject of the trade-mark, cannot escape antitrust scrutiny.

"Chicken Delight's assertions that only a few essential items were involved in the arrangement does not give us cause to reach a different conclusion. The relevant question is not whether the items are essential to the franchise, but whether it is essential to the franchise that the items be purchased from Chicken Delight. This raises not the issue of whether there is a tie-in but rather the issue of whether the tie-in is justifiable. . . . ."

"We conclude that the District Court was not in error in ruling as a matter of law that the arrangement involved distinct tying and tied products." 448 F.2d at 47–49.

The Ninth Circuit acknowledged the validity of one possible justification for a franchisor's use of tying arrangements: the maintenance of "quality control", but went on to caution:

"However, to recognize that such a duty exists is not to say that every means of meeting it is justified. Restraint of trade can be justified only in the absence of less restrictive alternatives. In cases such as this, where the alternative of specification is available, the language used in Standard Oil Co. v. United States, supra, 337 U.S. at 306, 69 S.Ct. at 1058, 93 L.Ed. 1371, in our view states the proper test, applicable in the case of trade-marks as well as in other cases. . . . ." 448 F.2d at 51.

We conclude that an approach similar to that of the Ninth Circuit in *Chicken Delight* is proper in the case at bar. Chief Judge Lumbard's views in dissent in *Carvel*, supra, help us reach this conclusion.

Copeland is one of the nation's leading manufacturers of compressors for refrigeration and air conditioning equipment. The one-year warranty which it extends on its products is available only through its franchised wholesalers. In addition, the franchised wholesalers are able to replace failed compressors at reduced prices, as a result of Copeland's financial assistance, even after the warranty period has expired. There can be little doubt but that the designation of a wholesaler as a Copeland "authorized" outlet is of great economic value to the wholesalers so designated. Similarly, the designation of a rebuilder as a Copeland "authorized" rebuilder is highly regarded as a competitive advantage in the rebuilding field. In summary, the Copeland trade-mark, like the Chicken Delight mark, is persuasive evidence of significant market leverage in the hands of Copeland. To this trade-mark Cope-

land has tied compressors rebuilt by "authorized" Copeland rebuilders and parts manufactured by Copeland.

The plaintiffs were entitled to have the jury instructed that Copeland's policies of barring its franchised wholesalers from dealing in compressors rebuilt by non-authorized rebuilders and of barring its franchised rebuilders from obtaining parts from non-Copeland sources, if proved by a preponderance of the evidence, constituted *per se* violations of the Sherman Act without the necessity of proof of "unreasonableness" and "anticompetitive effect". Special Issue Number 3(c) did not so inform the jury. This requires reversal of the judgment entered below, and remand for another trial before a jury instructed to this effect.

■ Entitlement of the plaintiffs to a *per se* instruction upon retrial will not end the inquiry into Copeland's liability under the antitrust statutes. As it contended on the first trial, Copeland will be able to assert that its franchising policies did not proximately cause the plaintiffs to suffer economic losses and that any reverses suffered by the plaintiffs were caused by their own technological and managerial mistakes. In addition, Copeland will be able to offer evidence tending to show that its franchising policies constitute the least restrictive techniques available for preserving the goodwill associated with the Copeland trade-mark.

■ Although the plaintiffs have been successful on this appeal in establishing their right to a *per se* Sherman Act jury instruction, it is clear that they still have a tortuous road to travel before they realize a monetary recovery in this matter. Unlike the plaintiffs in *Carvel* and *Chicken Delight,* the Warri-

ner plaintiffs are not franchisees of Copeland. The plaintiffs in this case claim to be foreclosed competitors and must sustain the burden of proving that but for the allegedly unlawful practices of Copeland vis-a-vis Copeland's franchisees, the plaintiffs would have done a certain amount of business with the franchisees. Because Special Issue Number 3(c) combined the elements of Copeland's conduct, proximate causation, and plaintiffs' damages into a single item for the jury's consideration, it is impossible for us to determine on this appeal what the triers of the facts found with respect to business allegedly foreclosed to the plaintiffs by Copeland's franchising practices. Upon retrial, the jury should be asked to render separate answers to special interrogatories on each of these elements bearing upon Copeland's liability for perpetrating an allegedly unlawful tying arrangement.

## CONCLUSION

The plaintiffs-appellants assign twenty asserted errors in the proceedings in the district court as grounds for reversal of the judgment entered below. Since we find that the inquiry to the jury regarding *per se* Sherman Act violations on Copeland's part was prejudicial error, we do not address ourselves to the other questions discussed in the briefs of the parties. Many of these concern matters of procedure which took place in the district court prior to and during the prior trial. They are unlikely to recur. Others are inconsequential and do not warrant discussion.

The judgment of the district court is reversed and the cause is remanded for a new trial.

Reversed and remanded.