George PUGH, d/b/a Palmer
Self-Service, Plaintiff,

v.

MOBIL OIL CORPORATION, Defendant.

Civ. A. No. G–81–296.

United States District Court,
S. D. Texas,
Galveston Division.

Jan. 25, 1982.

Donald H. Grisson, Austin, Tex., for plaintiff.

J. Todd Shields, Fulbright & Jaworski, Houston, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

HUGH GIBSON, District Judge.

### I

This case came on for hearing on October 21, 1981. The action was filed against Mobil Oil Corporation by George Pugh d/b/a Palmer Self-Service, who seeks damages and injunctive relief because of Mobil's attempted termination of the franchise relationship between Mobil and Pugh. Pugh bases his claims upon the Petroleum Marketing Practices Act (PMPA), 15 U.S.C.

1. *See* 15 U.S.C. § 2804(c)(3)(C).

§§ 2801–06; § 1 of the Sherman Act; 15 U.S.C. § 1; and § 3 of the Clayton Act, 15 U.S.C. § 14. The October 21st hearing concerned only the appropriateness of injunctive relief.

### II

The facts in this case are virtually undisputed. The only factual dispute established at the October 21st hearing was whether a PMPA summary statement[1] was contained in the notification Pugh received.

Plaintiff Pugh has been a Mobil dealer since September 1979, operating a Mobil-branded station known as Palmer Self-Service at 3551 Palmer Highway, Texas City, Texas. The pertinent franchise agreement was entered into by the parties on May 12, 1980.

This agreement consists of two principal documents, a retail dealer contract with a sign and equipment rent rider and a service station lease with a self-service agreement rider. These documents contain three paragraphs relevant to this action. Paragraph six in the retail dealer contract in sum prohibits the buyer, Pugh, from using the trademarks of the seller, Mobil, "in connection with the storage, handling, dispensing or sale" of any products other than Mobil's. Second, the same contract in paragraph fifteen requires Pugh to use his "best efforts to promote the sale" of Mobil's products which Pugh purchases under the contract. Finally, in paragraph eight in the service station lease Pugh agreed to use the pumps and other equipment on the station premises "solely for landlord's products."

Initially Pugh bought for resale only Mobil fuel. However, on June 22, 1981, Pugh accepted delivery of a load of regular and unleaded gasoline from a non-Mobil supplier. Pugh posted at the station signs which indicated that the gasoline was not Mobil fuel. Although Pugh attempted to obtain super unleaded gasoline from Mobil, the orders were refused.

Pugh's decision to sell non-Mobil fuel was based on economic reasons—Mobil fuel

could no longer be sold at a competitive price, and, as a result, Pugh was encountering serious financial difficulties. The procedure Pugh employed in buying, storing, and selling non-Mobil fuel is known as "debranding," about which Pugh had learned from fellow gasoline distributors in Corpus Christi, Texas, and elsewhere. Following their advice, Pugh pumped out his storage tanks, leaving between 200–300 gallons of Mobil fuel in them. Pugh debranded his station knowing that Mobil disapproved of his actions and had no debranding program; moreover, a Mobil representative had told him that such actions would violate the franchise agreement.

By letter of July 10, 1981, Mobil advised Pugh that he had violated the provisions of the franchise agreement. On July 21, 1981, Pugh was hand-delivered by a Mobil employee a copy of a letter notifying him of Mobil's decision to terminate the franchise relationship effective October 21, 1981. Pugh was advised that the original letter would be sent to him with some attachments.

The letter cited the following reasons for the termination: the use of Mobil's tanks for the storage of non-Mobil fuel, the obscuring of Mobil's trademarks, and the general depreciation of Mobil business by Pugh's conduct. Mobil alleged that § 8(b) of the service station lease and paragraphs 6 and 15 of the retail dealer contract were violated.

Because Pugh continued to sell non-Mobil fuel, on September 15, Mobil sent Pugh a second notice of termination effective September 30, 1981. Mobil reiterated the same reasons for its termination as those cited in the July 21st letter.

The parties have stipulated that both notification letters complied with the procedural requirements of § 2804(c) except that Pugh contends he never received the summary statement. § 2804(c)(3)(C).

Pugh continued to operate as a debranded distributor until the end of September. On September 23, 1981, he purchased a full load of Mobil gasoline and mixed it in the station pumps. Even with debranding, Pugh was unable to operate his station profitably, and his financial problems persisted. Finally, a disgruntled, unpaid independent supplier refused to make further deliveries to Pugh, and after Pugh abandoned the property and handed over the keys to him, the supplier confiscated the remaining fuel in the pumps and removed the station store inventory.

### III

This case comes within the scope of the Petroleum Marketing Practices Act because Pugh is a "franchisee" (FE) or retailer "authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment or distribution of motor fuel." § 2801(4). Mobil is a "franchisor" (FR) or a refiner who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment or distribution of motor fuel." § 2801(3). Finally, the agreement between Pugh and Mobil fits the Act's definition of "franchise"[2] because Mobil authorizes, permits and *requires* the use of its trademark with the motor fuel sold. *See, e.g.*, retail dealer contract ¶ 6; service station lease ¶ 8. Hence, the responsibilities and obligations of Pugh and Mobil comprise the "franchise relationship." § 2801(2).

The Petroleum Marketing Practices Act has a broad prophylactic goal of insuring that franchises are not *arbitrarily or unfairly* terminated or not renewed by franchisors. *Davy v. Murphy Oil Corp.*, 488 F.Supp. 1013, 1015 (W.D.Mich.1980); *Blankenship v. Atlantic Richfield Co.*, 478 F.Supp. 1016 (D.Or.1979); *Malone v. Crown Central Petroleum Corp.*, 474 F.Supp. 306, 309 (D.Md.1979); *Saad v. Shell Oil Co.*, 460 F.Supp. 114, 115 (E.D.Mich.1978).

The Court notes initially that Pugh's actions—mixing Mobil fuel with non-Mobil fuel, selling non-Mobil fuel in Mobil pumps, and posting signs which stated that non-Mobil fuel was being sold—were clear viola-

**2.** § 2801(1)(A) & (1)(B)(i).

tions of the franchise agreement. Pugh has not argued otherwise, but he has alleged that Mobil's termination procedure did not comply with the PMPA.

Three pertinent areas of the PMPA are at issue. All three are within interconnected sections 2802 and 2804. Section 2802(b)(1) allows termination of a franchise if the notification requirements of § 2804 are met and if the termination is based on one of the § 2802 grounds.

First, regarding section 2804(c), Pugh alleged that the "summary statement," which sets out the rights, remedies and relief of the PMPA, was not attached to the notices he received. Pugh also contended that the attempted termination failed to comply with § 2804(b)(2)(A). This section states that a FR may terminate a franchise if the FE fails to comply with a franchise provision which is "both reasonable and of material significance to the franchise relationship." § 2802(b)(2)(A). Pugh has claimed that paragraph eight in the service station lease is unreasonable because it violates antitrust laws. Finally, Pugh alleged that Mobil did not give the required 90-day notice. § 2804(a).[3] Mobil gave Pugh two notices—the first allowed a 90-day period before termination became effective, and the second gave only 15 days. Pugh argues that the second notice supplanted the first and that, therefore, the second notice was insufficient.

This aspect of the litigation concerns the appropriateness of injunctive relief.[4] The Act states that a court shall grant a preliminary injunction if

(A) the franchisee shows—
(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
(ii) there exist sufficiently serious questions going to the merits to make

such questions a fair ground for litigation;

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

§ 2805(b)(2). The Act assigns to the FE the burden of proving the termination of the franchise and gives the FR the burden of showing as "an affirmative defense" that the termination was permitted. § 2805(c).

■ As it reads and has been interpreted, the Act sets out standards for issuance of a preliminary injunction which are less burdensome than normally imposed, although a couple of cases have recited more traditional approaches. *Wojciechowski v. Amoco Oil Co.*, 483 F.Supp. 109, 112 (E.D.Wis.1980); *McFadden v. Amoco Oil Co.*, 486 F.Supp. 274, 275 (D.S.C.1979). Generally, courts have looked for some substance in plaintiff's claim which would support further litigation and consideration of the issue. *See Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302, 1304 (D.Minn.1979) (case must be a "fair one for litigation"); *Sexe v. Husky Oil Co.*, 475 F.Supp. 135, 136 (D.Mont.1979) (reasonable chance for success); *Saad v. Shell, supra* (a significant showing of something that would constitute some reasonable chance of success). Moreover, the hardships imposed on the FE need be only a bit greater than those suffered by the FR. *See Gilderhus v. Amoco Oil Co., supra* at 1304 (hardships need not be decidedly in favor of FE, and no showing of irreparable harm necessary).

■ The Court finds that under the standards set out in § 2805 the plaintiff has not met his burden of showing a sufficiently serious question going to the merits, and

---

**3.** Section 2804(a) requires as a general rule that the FR furnish notification "not less than 90 days prior to the date on which such termination ... takes effect." *See Blankenship v. Atlantic Richfield Co., supra*, at 1018 & n.15.

**4.** If a FR "fails to comply" with § 2802, a FE may bring a civil action against the FR. § 2805(a). The Act further empowers a federal district court to "grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with" section 2802. § 2805(b).

the Court also finds that the hardships imposed upon the FR by the issuance of a preliminary injunction would be greater than the hardships which would be imposed upon the FE if such relief were withheld.

First, the evidence that Pugh produced concerning the attachment of a summary statement to the notification letters did not demonstrate a sufficiently serious question going to the merits to make such question a fair ground for litigation. Beyond plaintiff's unsupported assertion that he never received the summary statement, no other evidence was offered. However, a significant amount of circumstantial evidence indicates that the summary statement was included. First, Pugh was told personally that the letter would be sent with attachments. The letters, in their last paragraphs, also stated that the summary statement was attached. Pugh also admitted that his employees would open mail at times. Moreover, the letters, especially the first, had been handled by three different lawyers and a representative of the Lone Star Service Station. Finally, the original of the July 21st letter has not been located by plaintiff. In sum, there is no substance to plaintiff's claim that would support further litigation and consideration of the issue.

In addition, the hardships which Mobil would suffer because of the issuance of a preliminary injunction would be far greater than those which would be suffered by Pugh if the injunction were not issued. At present, the station remains vacant and unused, subject to vandalism. Thus, Mobil has lost one commercial outlet for its fuel, and the company is deriving no income from the property. Moreover, signs indicating that non-Mobil fuel is sold on the premises continue to disparage Mobil's trademarks and goodwill. Further, Mobil continues to incur liabilities such as property taxes and insurance. If an injunction were imposed further postponing the termination of the franchise relationship, the Court finds a high likelihood exists that the property would remain as it is because Pugh's financial difficulties apparently prohibit his ability to reopen the business. Pugh's testimony indicates that his financial straits had existed for some time before the sale of non-Mobil fuel and were not alleviated by debranding. In addition, any chance of reopening his station would be very slight because Pugh would have to refinance the entire operation. Finally, even if it could be refinanced and a preliminary injunction were ordered, this Court would order Pugh to buy and resell only Mobil fuel per the franchise agreement. Clearly Pugh's worst financial problems sprung from his inability to sell Mobil fuel at a profit. In sum, the issuance of a preliminary injunction would result in continued suffering by Mobil because most likely the property would remain abandoned.

On the other hand, if the injunction were not issued, Pugh would not be in a worse position than he already is. Pugh has abandoned voluntarily the operation of his station; therefore, the lack of injunctive relief will not subject his business to immediate closure. The lack of relief, however, will finally foreclose his opportunity to refinance his business. But because Pugh has shown no reasonable chance that this refinancing is possible, the Court finds that Pugh will not suffer any significant hardship. Consequently, on balance the prospective hardships facing Mobil are greater than those facing Pugh.

Hence, the Court deems injunctive relief an inappropriate remedy for plaintiff's alleged claim that the PMPA summary statement was not attached to the notification.

Pugh has also argued that Mobil's assertion of its right to terminate based upon paragraph 8 of the service station lease is not "both reasonable and of material significance to the franchise relationship," § 2802(b)(2)(A). The plaintiff vaguely claimed that paragraph 8 violates either § 1 of the Sherman Act, 15 U.S.C. § 1 and/or § 3 of the Clayton Act, 15 U.S.C. § 14, as an impermissible "tying arrangement" or an impermissible "exclusive dealing" contract.

Supreme Court decisions regarding tying arrangements have been concerned with

what power the seller has in the tying product and what effect the tie-in has on the sales in the tied market. These concerns are based on the leverage theory, that a monopoly, patent control, or "dominance" in one product would restrain competition or create a monopoly in the second product. The legal standard announced by the Court amounts to a *per se* ruling, that is, anticompetitive effects are presumed from foreclosure of a certain dollar volume. *See United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *International Business Machines v. United States*, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936).

The Fifth Circuit has recognized that "tying principles are fully applicable to franchise sales." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 376 (5th Cir. 1977). *See Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39 (5th Cir. 1976); *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.*, 463 F.2d 1002 (5th Cir.), *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972). *See also Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).

These cases have also noted a limited defense to a tying allegation. A franchisor may show that the tie constitutes a necessary device for quality control of the end product sold to the public. However, a franchisor must show that the tying arrangement is the least restrictive burden on commerce. *Kentucky Fried Chicken v. Diversified Packaging, supra* at 375; *Carpa v. Ward, supra* at 46–47; *Warriner Hermetics v. Copeland Refrigeration, supra* at 1015; *Baker v. Simmons Co.*, 307 F.2d 458 (1st Cir. 1962).

For example, in *Baker v. Simmons Co., supra*, the Simmons Company had a sign program under which motels could lease highway signs from the company. These billboards advertised the motel and also stated that the motel used only Beautyrest mattresses. In order to lease a sign, the motel had to assure Simmons that the motel actually had Beautyrest mattresses in its rooms. The First Circuit held that the tie between the lease of the signs and requirement that Beautyrest mattresses be in the rooms was not impermissible. Instead the court found that Simmons' reputation and goodwill were ample justifications for the program. *Id.* at 469.

In this case, beyond the franchise agreement itself, Pugh presented no evidence of a tying arrangement. However, even if paragraph 8 is assumed to create a tying arrangement, Mobil's need to protect its goodwill and reputation justifies the contract clause.

Pugh's argument that paragraph 8 is an exclusive dealing contract fails because Pugh produced no evidence whatsoever showing that competition was substantially lessened by the contract. *See Tampa Electric Co. v. Nashville*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Standard Oil v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). Therefore, Pugh has failed to establish any prima facie evidence of an impermissible exclusive dealing arrangement.

In sum, Pugh has not shown that a sufficiently serious question going to the merits existed regarding the alleged antitrust violations.

Finally, the plaintiff has argued that the second notice of September 15th supplanted the first, that the second was invalid in that it gave less than 90-day notice (§ 2804(a)(2)) without proper justification, and that the first and second notice may not be read together. *See Davy v. Murphy Oil Corp., supra*, at 1016 (two defective notices should not be read together; Act speaks in terms of one notice).

The Court finds that the first notice of termination meets all the standards of the PMPA. Therefore, there was no need to read both notices together. The existence of the second notice did not eliminate

or affect the validity of the first. Therefore, the first was not supplanted by the second. Because the first notice is proper in all respects, its validity remains untouched.

In addition, this Court will not issue a preliminary injunction in any event because as discussed above, the burdens that would be imposed on Mobil exceed those which would be imposed on Pugh.

For the reasons discussed above, it is ORDERED, ADJUDGED and DECREED that plaintiff's motion for a preliminary injunction is hereby DENIED.