622 F.2d 1160
 8 O.S.H. Cas.(BNA) 1317, 1980 O.S.H.D. (CCH) P 24,485
The BABCOCK & WILCOX COMPANY, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and
Secretary of Labor, Respondents.
 No. 79-1371.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 11, 1980.
Decided May 15, 1980.
 
 Francis Carling (argued), Sullivan & Cromwell, New York City, for petitioner.
 Thomas L. Holzman (argued), Rita E. Selligson, Allen H. Feldman, Carin A. Clauss, Sol. of Labor, Washington, D. C., Marshall H. Harris, Regional Sol., Philadelphia, Pa., Nancy L. Southard, U. S. Dept. of Labor, Washington, D. C., for respondent Secretary of Labor.
 Benjamin W. Mintz, Associate Sol. for OSHA, Ronald R. Glancz, Marleigh Dover Lang, OSHRC, Washington, D. C., for respondent OSHRC.
 Before SEITZ, Chief Judge, and ADAMS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The combination of molten steel and water can cause an explosion and injury to those nearby. In this OSHA case, the employer was found to have committed a serious and willful violation of the general duty clause when molten metal was poured into a large ladle despite the presence of water on the floor of the steel plant. Because the record does not demonstrate the degree of culpability required, we vacate the finding of willfulness. The case will be remanded to the Commission, however, for reconsideration of the penalty since the record supports the finding of a serious violation of the Act.
 
 
 2
 As a result of an inspection on August 17, 1977, a Department of Labor compliance officer issued a citation to the Babcock & Wilcox Company alleging a willful violation of the general duty clause of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678 (1976 & Supp. II 1978),[1] and proposed a penalty of $10,000. After a hearing before an Occupational Safety and Health Review Commission administrative law judge, the offense was rated as serious and willful, but the penalty was reduced to $3,000. When no member of the Commission asked for review, the report became a final order, 29 U.S.C. § 661(i) (Supp. II 1978), and the company petitioned this court for review under 29 U.S.C. § 660(a) (1976).
 
 I.
 
 3
 Babcock & Wilcox manufactures steel tubing at its plant in Beaver Falls, Pennsylvania. In the "No. 2 melt shop" is an electric arc furnace that rests on two concrete piers and has a platform about 12 feet above ground for the use of the crew. The furnace is designed to melt scrap steel and has a capacity of 75 tons. Scrap is placed into the furnace over a period of five to eight hours until all of the contents have become molten. When the furnace is ready to be tapped, it is tipped forward and the molten metal is poured into a ladle, also with a 75 ton capacity. The ladle is mounted on a carriage that moves away from the furnace on rails to a position over a pouring pit. At that point, the steel is discharged into ingot molds through a nozzle set in the bottom of the ladle. A "stopper," which acts like a valve, controls the flow of metal through the nozzle.
 
 
 4
 At about 6 a.m. on August 17, water spilled from a malfunctioning "bosh," a drain forming part of the furnace cooling system. The water flowed over the platform and then to the floor below. The bosh was repaired and some, but not all, of the water on the floor in the area between the furnace and the pouring pit was removed. A puddle had formed along the right side of the track near the furnace, and the area between the puddle and the furnace was wet. A hot, five-ton mold was placed in the puddle to dry it, and dolomite, a granular material, was put down to keep water out of the pouring pit. In addition, two 50-pound sacks of "Quick-Dry," an absorbent material, were poured onto the water between the puddle and the furnace. Although the pallet stored nearby has a capacity of 36 sacks of Quick-Dry, these two were all that were available.
 
 
 5
 When the shift changed at 8 a.m., Robert Corcoran, the day-shift melter in charge of the No. 2 shop, came on duty. After learning of the bosh leak, he investigated the area in front of the furnace. Corcoran saw the water to the right of the tracks but did not see the ground directly in front of the furnace between the two rails of track because the ladle car was in position there. He made no effort to move the car and inspect the area beneath it but called a labor foreman to bring some men and Quick-Dry to finish cleaning up the spill. Because the nearby storeroom supply was exhausted, the foreman had to get a truck to carry a full pallet from the main plant one or two miles away. It was about noon when he returned to the melt shop.
 
 
 6
 At about 11:30 a.m., a Department of Labor compliance officer walked through the area on his way to perform an inspection at another part of the plant. He made no comment about the water at that time and returned about half an hour later accompanied by a union safety representative. When the crew began to tap the furnace, four employees were working in the vicinity, with the pitman 15 to 30 feet away. No objection to tapping was made by either the compliance officer or the union representative who were observing, and the loaded ladle was moved to the pouring pit without incident.
 
 
 7
 After the ladle had been rolled away from the furnace, the compliance officer stepped into the area between the rails where the car had been. He found that the ground was saturated, although the water had not puddled. About this time the labor foreman returned with the Quick-Dry, and he and his men began to remove the water.
 
 
 8
 At a conference with company officials following the inspection, the compliance officer characterized the presence of the water on the floor as a "serious" matter. Some weeks later, he cited the company for a "willful" violation and proposed a penalty of $10,000, the maximum civil penalty authorized for the offense. See 29 U.S.C. § 666 (1976). The company filed a timely notice of contest, and an administrative hearing was held. See id. § 659(a), (c); 29 U.S.C. § 661(i) (Supp. II 1978).
 
 
 9
 The ALJ found that approximately 120 to 220 gallons of water spilled near the furnace, accumulating in a puddle to the right of the track and saturating the area between the rails where the ladle was positioned when the furnace was tapped.[2] The company admitted it is commonly recognized in the steel industry that if water is enveloped by molten metal an explosion may result, and it is not disputed that there were two possibilities of molten metal escaping here: one, a "cut-through," which happens when a hole develops in the furnace lining; the other, a "runner," which occurs when metal unexpectedly flows through the ladle nozzle because the stopper is improperly seated.
 
 
 10
 In the absence of improper maintenance, a cut-through is an unpredictable, occasional occurrence. It was unlikely but possible that if one occurred, some molten metal might have reached the puddled area to the right of the tracks. Most of the metal would solidify before reaching that point, however, and what remained liquid might only create steam by pushing, rather than enveloping, the water. If a cut-through occurred in the very bottom of the furnace, molten metal would reach the area between the rails. A runner, somewhat more common than a cut-through, also would have allowed molten metal to run out into the area between the rails, in which event, according to some testimony, the ladle car would absorb most of the explosion.
 
 
 11
 The ALJ found that it was likely, but not certain, that the employees would have been able to leave the area before an explosion resulted from the metal reaching the water to the right of the tracks. But if they remained within range, he concluded that blobs or globs of molten metal could cause burns serious enough to require hospitalization.
 
 
 12
 There also were findings that the company had violated its announced safety policy of immediately removing water spilled in the vicinity of molten metal and had been remiss in failing to discover that water was present in the depression between the ladle tracks. In addition, the ALJ concluded that the furnace should not have been tapped until the water was removed, although it is uncommon in the industry to hold a fully-laden furnace.
 
 
 13
 The ALJ conceded that Corcoran did not know there was moisture between the rails but found that he was aware of the puddle to the right of the tracks and nevertheless took a chance, "albeit with good odds," that molten metal would not escape and envelop enough water to cause an explosion. The ALJ characterized Corcoran's conduct as "reckless" and, given the gravity of potential physical harm to employees, designated the offense as serious and willful. The Secretary's recommendation of a penalty of $10,000 was reduced to $3,000.
 
 
 14
 The company contends that there was no violation of the general duty clause and, in any event, no willfulness. These are discrete issues, and we will consider them separately.II.
 
 
 15
 The general duty clause requires an employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1) (1976). The duty imposed by the clause is intended to be achievable; only preventable hazards are required to be eliminated. Therefore, a hazard is "recognized" only when the Secretary demonstrates that feasible measures can be taken to reduce materially the likelihood of death or serious physical harm resulting to employees. Titanium Metals Corp. of America v. Usery, 579 F.2d 536, 543-45 (9th Cir. 1978); Empire-Detroit Steel v. OSHRC, 579 F.2d 378, 384 (6th Cir. 1978); National Realty and Construction Co. v. OSHRC, 489 F.2d 1257, 1265-67 (D.C.Cir. 1973). Moreover, either the employer must be aware of the hazard's existence, or, if he is ignorant of it, the industry must generally guard against it. Id. at 1265 n.32. In other words, the hazard must be reasonably foreseeable. Finally, it must be shown that the hazard causes or is likely to cause death or serious injury to an employee. It is not necessary to show that an accident occurred; it is enough to show that had one occurred, it is likely that death or serious physical harm to an employee would have resulted. Titanium Metals Corp. of America v. Usery, supra at 543.
 
 
 16
 The company contends that the Commission was limited by the language of the citation that the Act was violated "during a pour of molten steel." It asserts that the issue is not how quickly the water should have been removed or whether it is recognized as hazardous to operate a furnace with standing water in the vicinity but "whether in all the circumstances, it was a violation of the Act for Corcoran to have proceeded to tap the furnace despite the presence of water in the vicinity." Petitioner's Brief at 50.
 
 
 17
 The citation is not artfully worded and does not expressly accuse the company of allowing the water to remain for some time after it should have been removed. Nevertheless, the employer recognized that implicit in the offense charged was the allegation that the company should not have permitted the condition to exist in the area until the pour occurred. Indeed, much of the hearing was devoted to the steps that had and could have been taken to eliminate the water before the furnace was tapped.
 
 
 18
 We have no doubt that the employer was put on notice as to the nature of the Secretary's complaint. Citations must give fair notice to the employer so that it understands the charge being made and has an adequate opportunity to prepare and present a defense. Citations, however, are prepared by inspectors who are not legally trained and who should act with dispatch. For these reasons, citations should not be as tightly construed as other pleadings a grand jury indictment, for example. See National Realty and Construction Co. v. OSHRC, supra at 1264.
 
 
 19
 The company views the Commission's decision as echoing the precise terms of the citation and, hence, a per se ruling that any pour of molten metal in the vicinity of water is a violation of the Act. The offense as tried without objection, however, involved an additional consideration not expressed in the citation. The company ran afoul of the Act not because it tapped the furnace with water in the vicinity, but rather because it tapped the furnace with water needlessly in the vicinity.
 
 
 20
 The employer concedes in its brief that "water on the floor anywhere in a plant should be cleaned up, and water close enough to a furnace to be enveloped by molten metal in the event of a freak accident should be cleaned up as soon as it reasonably can be; this is exactly what the Employer's work rules require." Petitioner's Brief at 59. The evidence in this case that water remained on the floor for over six hours supports the finding that these work rules were violated.
 
 
 21
 In Empire-Detroit Steel v. OSHRC, supra, the court affirmed a Commission decision that a willful violation of the general duty clause had occurred, finding that water trapped by hot slag was a hazard that had caused repeated explosions, and that the employer had failed to implement alternative, safer methods of operation. The court did so only after acknowledging that the manufacturing process could not be carried out without some water being present, and the company was required to take only such steps as were reasonable to reduce the hazard, not necessarily eliminate it altogether. So, too, in the case at hand, it was the company's failure to take feasible precautions to reduce the risk of injury that resulted in the finding of liability and not simply the fact that the furnace was taped with water in the vicinity.
 
 
 22
 The company also contends that the Secretary failed to prove that any employee would likely suffer serious physical harm had an accident occurred. Its argument that an escape of molten metal was a rare occurrence and highly unlikely in the circumstances misses the mark. The issue is not whether an accident was likely to happen but rather whether, assuming one had occurred, it was likely that employees would have suffered serious physical harm. "(W)hen the violation . . . makes the occurrence of an accident with a substantial probability of death or serious physical harm possible, the employer has committed a serious violation . . . . The accident itself need only be possible, not probable." Bethlehem Steel Corp. v. OSHRC, 607 F.2d 1069, 1073 (3d Cir. 1979) (citations omitted).[3] The violence of an explosion depends on the quantities of water and metal involved, but the probability of personal injury to those in the vicinity cannot be denied.
 
 
 23
 On the record in this case, therefore, we hold that the Commission did not err in finding a violation of the general duty clause. Since the company does not contest the classification of the offense as serious, we will not disturb that portion of the order.
 
 III.
 
 24
 We are not prepared to say, however, that the company's decision to tap the furnace, coupled with its lack of diligence in removing the water, amounted to a willful violation of the Act.
 
 
 25
 In Frank Irey, Jr., Inc. v. OSHRC, 519 F.2d 1200 (3d Cir. 1974), aff'd in banc, id. at 1215 (1975), aff'd sub nom. Atlas Roofing Co. v. OSHRC, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), we observed that willfulness was not defined in the statute and stated that
 
 
 26
 "Willfulness connotes defiance or such reckless disregard of consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act. Willful means more than merely voluntary action or omission it involves an element of obstinate refusal to comply."
 
 
 27
 Id. at 1207. The evidence here does not support a charge of willfulness since the record makes clear that although the cleanup process was slow, the delay was not caused in deliberate or intentional disregard of the statute. There was no element of obstinacy demonstrated, nor even a showing that after giving instructions to the labor foreman, Corcoran had any idea of how long it would take to accomplish the rather simple mission. He did know that the labor foreman had to get a truck and release laborers from other assignments to perform the drying-out operation, but there was no indication that it would take as long as it did to complete the job. There was a lack of diligence, but not the intentional element necessary for a willful violation.
 
 
 28
 In our judgment, the ALJ failed to appraise properly the alternatives open to Corcoran. When the time for tapping the furnace arrived, Corcoran was confronted with a choice of proceeding despite the presence of water to the right of the tracks or delaying the pour. He decided to proceed rather than wait. This action was termed "reckless," although the odds against the occurrence of a spill were good.
 
 
 29
 The time element of the offense is important because of the two potential sources for an escape of molten metal. The record does not indicate that the pour has any special significance with respect to a cut-through, which could occur any time the metal in the furnace is in a molten state and the wall gives way. A runner, on the other hand, happens when molten metal is in the ladle and the stopper is improperly seated. A runner, therefore, only occurs during or after a tapping of the furnace. Because the bottom of the furnace is at a level one floor above the tracks where the ladle moves, a cut-through could cause metal to flow from a greater height and involve a larger area than a runner, which begins closer to the ground.
 
 
 30
 If Corcoran delayed the pour, the chances of a cut-through were increased because the longer the molten metal remained in the furnace, the greater the possibility that a weakness in the wall could occur. It follows that once the metal was removed from the furnace there could be no cut-through.
 
 
 31
 On the other hand, pouring the metal into the ladle created the potential for a runner. Although there was no reason to suppose that a cut-through or runner would take place, the risks really were in the alternative rather than in the conjunctive, except during the comparatively brief interval in the pouring process when molten metal was present in both the furnace and the ladle. If a runner occurred during the pouring process, the ladle car would have been moved over to the pouring pit and the metal allowed to flow into the molds. That flexibility to cope with the mishap was not available if a leak developed in the furnace itself.
 
 
 32
 Corcoran did not know that there was wet ground under the ladle car the place where metal would flow if a cut-through occurred in the very bottom of the furnace or if there were a runner. Thus, the record offers no support for the ALJ's finding that when Corcoran exercised one of the options available to him, one that arguably offered less hazard of injury to workmen, he acted recklessly. Certainly he did not obstinately refuse to comply with or act in defiance of safety rules, or proceed with such a disregard of consequences as to be equivalent to a knowing or conscious disregard of, or plain indifference to, or flaunting of, the general duty clause.[4]
 
 
 33
 We therefore conclude that the finding of a willful violation cannot be sustained. Since the penalty imposed was based on willfulness, it is necessary to remand the case to the Commission so that it may determine an appropriate amount under these changed circumstances.
 
 IV.
 
 34
 The ALJ appeared to be in doubt as to the proper meaning of "willfulness." He believed that the definition used by this court is "more restrictive" than the one applied by some other courts of appeals. Of course, if there were any difference, the Irey definition would remain the test for this court until overruled by the court in banc, by the Supreme Court, or by statutory amendment. Consequently, the Commission may expect that in a petition for review filed in this court, the Irey case will be applied. See Allegheny General Hospital v. NLRB, 608 F.2d 965, 970 (3d Cir. 1979).
 
 
 35
 We recognize, however, that under the Act an employer is free to ask for review in two, and in some circumstances three, circuits the one where the violation occurred, where the employer has its principal office, or in the District of Columbia, 29 U.S.C. § 660(b) (1976). The Commission, therefore, does not know to which court a case will be taken on a petition for review and, consequently, may be uncertain of the view to be followed. We think it appropriate in these circumstances to discuss the definitional problem to determine if there is a substantial difference in approach among the circuits.
 
 
 36
 In Wehr v. Burroughs Corp., 619 F.2d 276 (3d Cir. 1980), we noted "that this unfortunate word is capable of a multitude of meanings . . . . The starting point in any case is to ascertain the degree of culpability intended by Congress when using 'willful.' . . . As the Court has directed, we 'continue to recognize that context is important in the quest for the word's meaning.' " Id. at 281-82, quoting United States v. Bishop, 412 U.S. 346, 356, 93 S.Ct. 2008, 2015, 36 L.Ed.2d 941 (1973).
 
 
 37
 In Irey we observed that Congress intended that willful violations differ in character from those considered "serious." Both call for civil penalties, but the maximum authorized for the former is ten times that authorized for the latter. Willful conduct poses a special problem, one that Congress decided merited more severe sanctions. We examined this concern in Bethlehem Steel Corp. v. OSHRC, 540 F.2d 157 (3d Cir. 1976), and commented, "Though the legislative history is meager, it does provide some help in determining what Congress contemplated by the phrase 'willfully or repeatedly.' " Id. at 161.
 
 
 38
 The original Senate bill provided for a criminal penalty of not more than $10,000 and/or six months in jail for willful violations. At conference, the Senate's criminal provision was modified to apply only to willful violations that result in the death of an employee, and the House's civil penalty provision was adopted for all other willful offenses. "The genesis of 'willfully' in a criminal provision strongly suggests that it was originally meant to require a strong showing of intent." Id. The legislative history of this provision and the structure of the Act, therefore, support our conclusion in Irey that conduct more culpable than is generally required in the usual civil context is the minimum that Congress intended to be within the meaning of the term willful.
 
 
 39
 The supposed conflict among the circuits on this point has been generated by several courts of appeals reading into our Irey definition a requirement that the employer act with "bad purpose." Read in this fashion, Irey has not been followed by some circuits.[5] These courts had adopted various definitions, generally holding that willful means an act done voluntarily, with either an intentional disregard of, or plain indifference to, OSHA requirements. See, e. g., National Steel and Shipbuilding Co. v. OSHRC, 607 F.2d 311, 313-16 (9th Cir. 1979). In Cedar Construction Co. v. OSHRC, 587 F.2d 1303 (D.C.Cir.1978), the Court of Appeals for the District of Columbia Circuit, an ever-available forum under the statute, concluded that there is little, if any, difference between our approach and that taken by these other courts. Id. at 1305. We agree.
 
 
 40
 To our way of thinking, an "intentional disregard of OSHA requirements" differs little from an "obstinate refusal to comply"; nor is there in context much to distinguish "defiance" from "intentional disregard." "Flaunting the act" or "flouting it," as some would say, again carries the same meaning.[6] We also believe, as does the District of Columbia Circuit, that the same results would likely be reached in various cases, including the one here, regardless of the verbiage utilized. Id. For example, in Irey the Commission had affirmed a willfulness finding where a hearing officer equated the term with negligence. That, of course, would be inconsistent with the approach of any court to the definition of willful under OSHA.[7] It is not unusual that different words are used to describe the same basic concept. Our literature would indeed be sterile if that were not the case.
 
 
 41
 We conclude, therefore, that the company's conduct was not willful, and the petition for review will be granted to that extent. Having decided that a serious violation of the Act has been established, however, we will remand to the Commission only for reassessment of the penalty.
 
 
 42
 Each party to bear its own costs.
 
 
 43
 SEITZ, Chief Judge, dissenting.
 
 
 44
 I agree with the majority that the Commission properly determined that a violation occurred. In my view, however, a court is not free to substitute its judgment for that of the Commission in determining the willfulness of a violation if there was substantial evidence for the Commission's determination. Here, there was substantial evidence no matter what standard of willfulness is applied. The judgment concerning willfulness in this case necessarily rests on an assessment of the risks facing Corcoran and his response to those risks. I cannot say that the Commission lacked substantial evidence for its assessment of these factors, especially where the company had a policy of requiring expeditious removal of water. Although I would not be inclined to find willfulness were I free to do so, I feel constrained by our standard of review to conclude that affirmance of the Commission's order enforcing the citation is required.
 
 
 
 [1]
 Section 5(a)(1) of the Act is known as the "general duty clause." It provides:
 "(a) Each employer
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."
 29 U.S.C. § 654(a)(1) (1976).
 
 
 [2]
 The company challenges this and a number of other findings resolving conflicting testimony. We find these objections to be without merit since the findings are supported by substantial evidence. 29 U.S.C. § 660(a) (1976)
 We also deny the company's application for leave to adduce additional evidence on the location of the water because no showing has been made of "reasonable grounds for the failure to adduce such evidence in the hearing before the Commission." Id.
 
 
 [3]
 A violation of the Act is "serious" if, in addition to being likely, the risk of serious physical harm is substantially probable and results from a violation that the employer knows or should know exists. 29 U.S.C. § 666(j) (1976)
 
 
 [4]
 Although Corcoran was accused of a willful violation, it apparently was not obvious to the compliance officer and union safety representative who were present when the pour occurred but felt no urgency to stop it
 
 
 [5]
 National Steel and Shipbuilding Co. v. OSHRC, 607 F.2d 311, 313-16 (9th Cir. 1979); Georgia Elec. Co. v. Marshall, 595 F.2d 309, 317-19 (5th Cir. 1979); Kent Nowlin Constr. Co. v. OSHRC, 593 F.2d 368, 372 (10th Cir. 1979); Western Waterproofing Co. v. Marshall, 576 F.2d 139, 142-43 (8th Cir. 1978); Empire-Detroit Steel v. OSHRC, 579 F.2d 378, 384-85 (6th Cir. 1978); Intercounty Constr. Co. v. OSHRC, 522 F.2d 777, 779-81 (4th Cir. 1975)
 
 
 [6]
 In George Hyman Constr. Co. v. OSHRC, 582 F.2d 834 (4th Cir. 1978), the court did not adopt our use of the word "flaunting," which it recognized as synonymous with "flouting." Id., at 840; see Webster's Third New International Dictionary 867 (Unabr. ed. 1968). But see National Steel & Shipbuilding Co. v. OSHRC, supra at 314. Instead, the court used the phrase "an intentional disregard for the Act's safety standards." 582 F.2d at 840. In our view, "intentional disregard" flaunts the Act
 
 
 [7]
 In fact, "(m)erely negligent conduct is never deemed 'willful.' " Wehr v. Burroughs Corp., supra at 282. (3d Cir. 1980)