Don G. Di NAPOLI, d/b/a Dino's
Service, Plaintiff,

v.

EXXON CORPORATION and Exxon
Company, U.S.A. (a division of Exxon
Corporation), Defendants.

Civ. A. No. 81–3118.

United States District Court,
D. New Jersey.

Jan. 21, 1982.

Martin G. Margolis, P.A., by Richard G. Singer, Verona, N.J., for plaintiff.

Howrey & Simon, by Robert G. Abrams, Washington, D.C., Stryker, Tams & Dill, by

David Menzel, Newark, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

Plaintiff moved for summary judgment to enjoin defendant Exxon from terminating plaintiff's franchise, and has also moved for interim attorney's fees. Defendant has cross-moved for summary judgment or, alternatively, for an order dissolving the preliminary injunction.

## STATEMENT OF FACTS

On June 1, 1979, DiNapoli executed a retail service station lease and a sales agreement with Exxon under which DiNapoli operated an Exxon retail service station in Little Falls, New Jersey. The sales agreement specified that if the plaintiff were to cease selling Exxon's motor fuels, that plaintiff would discontinue using Exxon's trademarks in its business.

In February 1981, a credit dispute arose between DiNapoli and Exxon. Plaintiff claims that as a result of the dispute, Exxon refused to deliver fuel to plaintiff and that the last delivery was made on March 10, 1981. Exxon denies that it refused to deliver fuel to plaintiff. Defendant also contends that, in February 1981, plaintiff informed Arthur M. Dudley, Retail District Manager for Exxon's North Jersey District, that he intended to begin selling non-Exxon fuel at his station. During the conversation, it is alleged that Mr. Dudley reminded plaintiff that the sales agreement prohibited the sale of non-Exxon motor fuel under Exxon's trademarks, and that the agreement also prohibited any action which would diminish the value of the trademark rights.

On March 25, 1981, plaintiff was still selling Exxon fuel, but he also began selling non-Exxon motor fuel. Before he began selling the non-Exxon fuel, plaintiff put white tape over the word "Exxon" on each of the pumps where the non-Exxon fuel was being sold, and covered with paint the Exxon tiger insignia on the "Exxon Unleaded Extra" pump panel. Plaintiff claims

that he also instructed his employees to inform any customer who asked, that the gasoline sold was not Exxon gasoline.

Defendant claims that plaintiff's efforts to disassociate his sales of non-Exxon gasoline from the Exxon trademark were inadequate. In support of its claim, defendant notes that Exxon's trademarks were still prominently displayed on the premises in many places: on a large pole sign in front of the station; on the canopy over the gasoline pumps; on a sign over the garage bays; on a sign above the station's office door; on a sign in front of the office; on plaintiff's invoices; and on the uniforms of plaintiff's employees. In addition, defendant claims that misrepresentations were made as to the identity of the gasoline to defendant's affiants. In one case, defendant notes that plaintiff accepted an affiant's charge plate in payment for gasoline and, on the charge slip, marked the box "Exxon Unleaded Extra".

On or before April 2, 1981 Richard L. Miniter, the Exxon Sales Representative assigned to plaintiff's station since January 1, 1981, delivered a set of detailed, illustrated, guidelines for deidentification to DiNapoli. Plaintiff denies that these materials were left with him, claiming that Miniter showed him only the front page of the materials and flipped through the rest of the pages. Plaintiff also denies receiving a copy of the same guidelines which defendant alleges had previously been mailed to him on March 14, 1980. In addition, plaintiff contends that Mr. Miniter, in late March, told plaintiff that his efforts to deidentify the gasoline were "okay for now", and also told plaintiff that he would receive a deidentification "kit", which plaintiff claims was never delivered.

As of April 3, 1981, plaintiff no longer sold Exxon gasoline at his service station. On April 22 and 24, photographs were taken of the station, which defendant claims indicate that no further steps had been taken to remove the Exxon trademarks from the premises. On July 23, 1981, Exxon delivered written notice to plaintiff stating that the service station lease, sales agreement,

and franchise relationship would be terminated effective 12:00 noon on October 22, 1981.

This court subsequently granted plaintiff's request for a temporary restraining order enjoining Exxon from terminating plaintiff's franchise. On November 23, 1981, the court granted plaintiff's motion for a preliminary injunction enjoining termination. The court found that a hearing would be necessary to determine whether defendant would be estopped from terminating plaintiff's franchise because of the statement allegedly made by Exxon's agent that DiNapoli's deidentification efforts were "okay for now."

## DISCUSSION OF THE LAW

■ In seeking to terminate plaintiff's franchise, Exxon asserts claims under the Petroleum Marketing Practices Act (PMPA). The purpose of the Act is to protect franchisees from "arbitrary or discriminatory" termination practices by franchisors. S.Rep. No. 95–731, 95th U.S.Code Cong. & Ad.News 873, 874. Although Congress intended "to protect franchisees from heavy-handed practices by oil companies," *Gilderhus v. Amoco Oil Co.,* 470 F.Supp. 1302, 1305 (D.Minn.1979), it also recognized "the legitimate needs of a franchisor to be able to terminate a franchise." S.Rep. No. 95–731, at 19, U.S.Code Cong. & Admin. News 1978, p. 877. The legislation thus contained a set of rules governing the rights of franchisors and franchisees with respect to termination of a franchise. *Id.* Defendant contends that under two of these rules, 15 U.S.C. § 2802(c)(10) and 15 U.S.C. § 2802(b)(2)(A), it has the right to terminate plaintiff's franchise.

Under 15 U.S.C. § 2802(b)(2)(A), a franchise may be terminated if a contract provision, which is "both reasonable and of material significance to the franchise relationship" is violated, and the franchisor gives notice of termination not more than 120 days after it "first acquired actual or constructive knowledge" of the violation. In paragraph 11 of the sales agreement between DiNapoli and Exxon, DiNapoli agreed to protect the value of Exxon's trademarks. DiNapoli specifically agreed to discontinue the posting of Exxon's trademarks immediately upon ceasing to sell Exxon gasoline.

■ The trademark provision of the contract is both "reasonable and of material significance to the franchise relationship." The provision allows Exxon to determine what gasolines will be sold under its trademark. Without this type of control, inferior gasolines could be sold under the Exxon trademark, thereby diminishing the mark's value.

Plaintiff contends that Section 2802(b)(2)(A) was not intended to apply to contractual provisions relating to trademark protection. Plaintiff reasons that another provision of the PMPA allows a franchisor to terminate the franchise for "willful" trademark violations and that this standard is undermined if the franchisor is permitted to terminate a franchise merely for "breach" of a trademark protection clause of a contract. Plaintiff thus argues that Section 2802(b)(2)(A) eviscerates the "willfulness" standard of Section 2802(c)(10), which requires an inquiry into the franchisee's state of mind.

Plaintiff's argument must be rejected. Section 2802(c)(10) merely provides a standard for terminating franchises for trademark violations where the contract makes no provision for trademark protection. In enacting Section 2802(b)(2)(A), Congress recognized that reasonable and material contract provisions were vital to the franchise relationship. Congress thus not only recognized the value of the contract to the franchisor but also provided the franchisor with the remedy of termination for its breach. The court therefore rejects plaintiff's contention that Section 2802(b)(2)(A) is inapplicable to this case.

■ The court also rejects plaintiff's assertion that Section 2802(b)(2)(A) requires that the termination of the franchise relationship be "reasonable." Section 2802(b)(2)(A) requires only that the disputed provision of the contract be "reasonable and material." It does not require that the

termination itself be reasonable. Because the contractual provision relating to trademarks is essential to Exxon's ability to maintain the integrity of its trademark, the provision is found by this court to be both "reasonable and material."

■ Plaintiff next claims that he should be granted summary judgment because even if he breached the sales agreement in violation of 2802(b)(2)(A) and willfully violated the trademark pursuant to 2802(b)(2)(C) and 2802(c)(10), that Exxon failed to give the notice required by these provisions. The provisions require that notice of termination be given not more than 120 days after the franchisor actually or constructively first acquired knowledge of the violation. Here, plaintiff denies that it violated Exxon's trademark, and Exxon, itself, concedes that no violation occurred before April 3. Therefore, because the earliest date on which a violation could have occurred was April 3, the termination notice, which was mailed on July 23, was within the 120 day statutory period.

Because plaintiff breached a "reasonable and material" term of the contract and because Exxon provided adequate notice of termination, the court finds that technically Exxon has made out a case for termination under Section 2802(b)(2)(A). Nevertheless, the court must still determine whether defendant should be estopped from terminating the contract because it allegedly indicated to DiNapoli that his efforts at deidentification were "okay for now."

■ To establish an estoppel, "a false representation or concealment of material facts must be made, by a person with knowledge, actual or constructive, of the real facts, to a person without such knowledge, with the intention that it shall be acted on by the latter person, and he must so rely and act thereon that he will suffer injury or prejudice by the repudiation or contradiction thereof. . . ." *National State Bank v. Terminal Construction Corp.,* 217 F.Supp. 341, 359 (D.N.J.1963), *aff'd,* 328 F.2d 315 (3d Cir.1964). Exxon contends that although, prior to April 3, it might have been estopped from terminating the contract because its agent allegedly told

DiNapoli that his deidentification efforts were "okay for now," the situation changed on April 3, when DiNapoli was no longer selling any Exxon gasoline. Exxon contends that DiNapoli could no longer rely on the statement once he stopped selling Exxon gasoline.

Plaintiff has a different interpretation of the statement made by the Exxon agent. Plaintiff contends that the agent indicated that it was sufficient to cover the word "Exxon" on the pumps where Exxon gasoline was not being sold. On the day that Exxon's agent allegedly gave his approval to DiNapoli's deidentification efforts the word "Exxon" was thus covered on two of the station's three pumps. Subsequently, when DiNapoli was no longer selling any Exxon gasoline, he claims that he covered the word "Exxon" on the third pump. DiNapoli thus contends that his conduct after April 3 was consistent with his conduct on the day that the agent allegedly gave his approval.

■ In addition, DiNapoli claims that under the Sales Agreement, Exxon was obligated to notify him in writing if it had reason to believe that he was engaged in fraudulent, unscrupulous or unethical business practices. Section 18(c) of the Sales Agreement provides:

If Seller has cause to believe that Buyer has engaged in fraudulent, unscrupulous or unethical business practices (which shall include but not be limited to practices forbidden by federal, state or local laws or regulations), Seller shall give Buyer written notice of its belief and shall state the specific grounds therefor. Following the receipt of such notice, Buyer shall be given reasonable opportunity to discuss the matter with Seller's representatives. If, following such discussions (or reasonable opportunity therefor) and after such investigation of the matter as is reasonable under the circumstances, Seller reaches a good faith conclusion that Buyer has engaged in one or more such practices, Seller shall have the right to terminate this contract.

DiNapoli claims that he was neither given written notice prior to the termination

decision, nor reasonable opportunity to discuss with Exxon his alleged violations of the PMPA. Therefore, Exxon's compliance with the terms of the contract creates an issue of fact, which cannot be resolved on a motion for summary judgment. In addition, because there is a factual dispute as to whether Exxon's agent gave his approval to DiNapoli's deidentification efforts and how that approval, if given, influenced DiNapoli's subsequent conduct, this case cannot be decided on a summary judgment motion. New Jersey courts recognize that the elements of an estoppel are essentially factual and therefore the courts disfavor disposing of such a claim on a summary judgment motion. *Swisscraft Novelty Co. v. Alad Realty Corp.*, 113 N.J.Super. 416, 423, 274 A.2d 59 (App.Div.1971).

■ Similarly, the question of waiver presents a factual question generally inappropriate to a summary judgment motion. A waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Barker v. Wingo*, 407 U.S. 514, 525, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101 (1972). Exxon argues that when the alleged statement was made by its agent, the agent waived Exxon's right to sue DiNapoli for conduct occurring prior to April 3 but did not waive Exxon's right to sue for the violation which first occurred on April 3. Again, the extent of the waiver would be best examined at a hearing and not on a motion for summary judgment. Therefore, the court denies defendant's motion for summary judgment for plaintiff's alleged violation of Section 2802(b)(2)(A).

For the same reasons, the court will not grant Exxon's motion for summary judgment for plaintiff's alleged violation of Sections 2802(b)(2)(C) and 2802(c)(10), which, when read together, permit termination of a franchise for "willful" trademark violations. Although Exxon complied with the notice provisions of Section 2802(b)(2)(C), there remains a question as to whether Exxon is estopped from asserting a willful violation where it might have specifically approved of DiNapoli's conduct.

DiNapoli contends that if Exxon is willing to concede, as it is for purposes of this motion, that his conduct was not "willful" before April 3, then his conduct after April 3, which was consistent with his prior conduct, must not, as a matter of law, constitute a willful violation of Exxon's trademark rights. Plaintiff's argument is in error.

■ A "willful" violation under Section 2802(c)(10), requires "a conscious, intentional, deliberate and voluntary act." *Gilderhus v. Amoco Oil Co.*, 1980–81 Trade Cases (CCH) ¶ 63,648, at 77,495 (D.Minn.1980). "Proof of willfulness under this provision does not require proof of bad motive, nor does evidence of good faith negate the willfulness of an act covered by said provision." *Id.* Although plaintiff urges that "willfulness" requires obstinacy or bad purpose pursuant to the Third Circuit's interpretation of the word in OSHA cases, plaintiff is mistaken. Plaintiff's argument was disposed of in *Babcock & Wilcox Co. v. Occupational Safety & Health Review Commission*, 622 F.2d 1160 (3d Cir.1980), where the Third Circuit stated that "an intentional disregard of OSHA requirements differs little from an obstinate refusal to comply." *Id.* at 1167.

Accepting that a "willful" act is one which is "conscious, intentional, deliberate and voluntary," plaintiff again is in technical violation of the PMPA. Nevertheless, if the factfinder treats the alleged statement of Exxon's agent as an estoppel, then Exxon will be barred from asserting the rights granted to it under the PMPA.

A similar problem arose in *Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302 (D.Minn. 1979). In *Gilderhus*, plaintiff claimed that its franchise was being terminated because it had sued the franchisor. The court stated, in considering the termination action which was brought under Section 2802(c)(10), that "it seems doubtful that the finder of fact would find plaintiff's transgressions wilful if, as he claims, he was unaware that his practices violated the franchise agreement and he was told by local Amoco agents that he could buy fuel products elsewhere when Amoco was unable to supply them. Thus there appears to be a serious question as to wilfulness." *Id.*

at 1305. In a latter hearing on the same matter, the court declared that "Allowing Amoco to effect what might in fact be proven to be a retaliatory termination while maintaining technical compliance with the Act would violate the spirit and intent of the act." *Gilderhus v. Amoco Oil Co.,* 1980–81 Trade Cases (CCH) ¶ 63,649, at 77,496 (D.Minn.1980).

Similarly, here, plaintiff alleges that the action to terminate his franchise arose from a credit card dispute that plaintiff was having with Exxon. Thus, there is a question as to whether Exxon was taking retaliatory action against DiNapoli in seeking to terminate his franchise. There is also a question of whether Exxon's action is barred by the doctrines of waiver or estoppel. These issues require determination by a factfinder and are inappropriate on a motion for summary judgment.

■ For the foregoing reasons, the court denies the motions for summary judgment relating to Sections 15 U.S.C. § 2802(b)(2)(A) and 15 U.S.C. § 2802(c)(10). In addition, the court denies defendant's motion to dissolve the preliminary injunction because plaintiff has raised a meritorious issue.

■ The court shall also dismiss all claims brought under the New Jersey Franchise Practices Act. Section 2806(a) of the PMPA provides that "[t]o the extent that any provision of this subchapter applies to the termination ... of any franchise ... no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination ... of any such franchise ... unless such provision of such law or regulation is the same as the applicable provision of this subchapter." 15 U.S.C. § 2806(a). Thus, the PMPA preempts any state law governing the termination of franchise relationships that "is not the same as" the PMPA. *Ted's Tire Service, Inc. v. Chevron U.S.A. Inc.,* 470 F.Supp. 163, 165 (D.Conn.1979).

■ In *Ricco v. Shell Oil Co.,* 180 N.J. Super. 399, 403, 434 A.2d 1151 (Ch. Div. 1981), the New Jersey Superior Court held that a claim of unlawful termination of a gasoline franchise was cognizable only under the PMPA and was not cognizable under New Jersey's franchise statute. Accordingly, Counts 1 through 5 of plaintiff's complaint are dismissed to the extent that they are brought under the New Jersey Franchise Practices Act.

■ In addition, plaintiff's claim for interim attorney's fees is denied. Plaintiff cites no statute or case law which would entitle him to interim attorney's fees. Although the PMPA does make provision for an award of attorney's fees to a prevailing franchisee, neither party has yet prevailed. Therefore, because, as plaintiff recognizes, such relief is extraordinary, this court denies plaintiff's application.

■ Finally, in count 6 of his complaint, plaintiff seeks to be reimbursed, should his franchise be terminated, for the reasonable value of his business, which includes, but is not limited to the equipment, improvements, fixtures, good will, and other investments by the plaintiff in the business. This claim is premature and cannot be appropriately decided until a hearing is held and the outcome of this case is determined.