In re ANNE CARA OIL COMPANY, INC., Debtor.

SHELL OIL COMPANY, Plaintiff,

v.

ANNE CARA OIL CO., INC. and William Humphrey Tucker, United States Trustee, Defendants.

Bankruptcy No. 4–83–0170–G.
Adv. No. 4–83–070.

United States Bankruptcy Court, D. Massachusetts.

Sept. 1, 1983.

Charles Donelan, John B. Nolan, Day, Berry & Howard, Boston, Mass., for plaintiff.

Norman Novinsky, Goodman & Novinsky, P.C., Brockton, Mass., for defendants.

Gerrard Kelley, Boston, Mass., U.S. Trustee's office.

## MEMORANDUM ON COMPLAINT FOR RELIEF FROM STAY

PAUL W. GLENNON, Bankruptcy Judge.

Anne Cara Oil Co., Inc. ("Anne Cara" or "debtor") is the lessee of certain premises located in Leominster, Massachusetts pursuant to a motor fuel station lease ("lease") entered into on July 14, 1982 with the plaintiff, Shell Oil Company ("Shell"). The lease was to be effective for the term beginning January 1, 1983 through December 31, 1985 unless extended (pursuant to certain requirements not applicable herein) and could be terminated by Shell, at its option, upon notice (as defined by the Petroleum Marketing Practices Act ("PMPA")) for any one of a number of enumerated grounds. On the same date, Anne Cara and Shell entered into a dealer agreement ("agreement") whereby the debtor was granted the right to use the Shell trademark and sell Shell products. The agreement contained a provision prohibiting Anne Cara from mixing Shell products with non-Shell products and from offering for sale non-Shell products. The term of the agreement was concurrent with that set forth in the lease. Termination was governed by grounds similar to those which governed the lease.

The PMPA, 15 U.S.C. §§ 2801 *et seq.* (effective June 19, 1978) regulates oil franchising. It was enacted, *inter alia,* "to provide for the protection of franchised distributors and retailers of motor fuel . . .", S.Rep. No. 731, 95th Cong. 2d Sess. 1 (1978), U.S.Code Cong. & Admin.News 1978, p. 873, and to "[establish] . . . minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." *Id* at 15, U.S.Code Cong. & Admin.News 1978, p. 873. Under the terms of 15 U.S.C. § 2801, the lease and dealer agreement created a franchise relationship the termination of which is subject to the standards of the PMPA. *See also Frisard v. Texaco, Inc.,* 460 F.Supp. 1094 (E.D.La.1978).

In enacting the PMPA, Congress was mindful of the often-times unequal bargaining positions of franchisors (large oil companies) and potential franchisees. Typically, in addition to the prohibitions contained in the dealer agreement, the oil company owns the land on which the gas station is

situated, and the oil company is in a position to set the rental price, minimum gallonage requirements, hours of operation and sales of tie-ins (e.g. tires, batteries and accessories). Prior to the enactment of the PMPA, oil companies were subject only to state law requirements when terminating franchises, which produced varying results across the country.[1] *See generally* S.Rep. *supra* at 17–19 and Note, *Retail Gasoline Franchise Terminations and Nonrenewals under Title I of the Petroleum Marketing Practices Act,* 1980 Duke L.J. 522. The PMPA attempts to remedy any previous disparities.

By providing detailed preconditions of termination (15 U.S.C. § 2802), the PMPA "establishes protection for franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep. *supra* at 15, U.S.Code Cong. & Admin.News 1978, p. 874. Where appropriate, a franchisee may seek money damages and injunctive relief in District Court (without regard to the amount in controversy) if he believes the relationship was wrongfully terminated. The franchisor has the burden of proving compliance with the PMPA. 15 U.S.C. § 2805.

15 U.S.C. § 2802 sets forth the grounds for termination, i.e., "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship ..." and "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable ...". The latter ground includes "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled", "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee", and "knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the operation of the ... premises." 15 U.S.C. § 2802(c). Under the terms of the franchise relationship, the relevant grounds for termination include the grounds set forth above. Under 15 U.S.C. § 2804, notice of termination must be provided at least ninety days prior to the date set for termination and must be in writing, sent by certified mail or personally delivered to the franchisee, contain a statement of the franchisor's intent to terminate the franchise and the reasons therefor, the date on which termination takes effect, and a summary of Title I of the PMPA as published in the Federal Register.

In the instant case, Shell sent a letter, certified mail, to William Hannigan ("Hannigan") the president of Anne Cara[2], on January 12, 1982[3] [sic]. The grounds for termination were stated as failure to timely pay Shell all monies due. The date of termination was set for April 15, 1983. In all respects, the letter appears to satisfy the requirements of the PMPA. On March 15, 1983, Shell again mailed a notice of termination to Hannigan, repeating the balance due and reaffirming the April 15, 1983 date of termination. The grounds set forth in the second letter were the mixing of Shell products with non-Shell products.[4] Even though it appears that the PMPA was enacted to offer protection to the rights of franchisees rather than franchisors,[5] it is

---

1. To alleviate any disparity among the states, the PMPA provides that for premption of state law in those areas in which the PMPA deals if there is a conflict. 15 U.S.C. § 2806.

2. Although the letter was not signed by Hannigan in acknowledgment of its receipt, Anne Cara's answer to the complaint filed by Shell admits to having received this notice.

3. As the letter refers to events in November of 1982, and speaks of termination on April 15, 1983, the Court can only assume the letter was sent on January 12, 1983.

4. By copies of checks to a non-Shell supplier introduced into evidence, the Court finds that the debtor purchased non-Shell gasoline as early as December 31, 1982.

5. The general rule is "no franchisor ... may terminate any franchise ... prior to the conclusion of the term, or the expiration date, stated in the franchise...". It is only the exceptions

beyond dispute that "[o]nce a franchisee accepts the legal and contractual obligations of the franchise agreement, he is not free to disregard them." *Crown Central Petroleum Corp. v. Waldman,* 515 F.Supp. 477, 485 (M.D.Pa.1981), *aff'd mem.,* 676 F.2d 684 (1982).

The Senate Report recognizes that "[t]ermination is an extreme remedy. It is fundamentally punitive and not compensatory in nature, i.e., the franchisor is not compensated for any financial injury experienced by reason of the franchisee's contractual violations .... On the other hand, franchise termination may be appropriate as a remedy for franchisee misconduct in some cases. Some contractual violations, although not readily reducible to a dollar value, may be so serious as to undermine the entire relationship." S.Rep. *supra* at 18, U.S.Code Cong. & Admin.News 1978, p. 876. A number of courts have found that the commingling of franchisor gasoline with non-franchisor gasoline is so serious a violation to be valid grounds for termination under 15 U.S.C. § 2802. *See e.g., DiNapoli v. Exxon Corp.,* 549 F.Supp. 449 (D.N.J. 1982); *Pugh v. Mobil Oil Corp.,* 533 F.Supp. 169 (S.D.Tex.1982); *Haynes v. Exxon Co.,* 512 F.Supp. 543 (E.D.Tenn.1981); and *Gilderhus v. Amoco Oil Co.,* 470 F.Supp. 1302 (D.Minn.1979). The PMPA itself lists failure to pay the franchisor as grounds for termination.

On April 14, 1983, Anne Cara filed its Chapter 11 petition. Its schedules revealed a total secured debt of $10,035.00 and total unsecured debt of $31,018.85 (of which $15,000 was listed as owing to Shell). The total number of creditors is five (a local bank holds two separate secured claims and three unsecured claims) including debts owing the Internal Revenue Service and the Commonwealth of Massachusetts for taxes. Total assets are listed in the amount of $25,800.00.[6] On April 29, 1983, on the verified

complaint of Shell and upon a short order of notice, the Court entered an order preliminary enjoining Anne Cara from: using and selling non-Shell products under the Shell trademark, commingling Shell products with non-Shell products, and further using the Shell trademark. The Court declined to enjoin the debtor from further using the leased premises.[7] The debtor's counsel was aware of the hearing yet did not appear. A further hearing on the merits of Shell's complaint was held. The complaint alleged that the franchise relationship terminated April 15, 1983 which termination is grounds for relief from the automatic stay of 11 U.S.C. § 362(a). Additionally, the defaults in the franchise relationship are incurable and therefore no adequate protection could be offered to Shell, cause exists to grant Shell relief from the stay, no means exist whereby the debtor could assume the contracts under 11 U.S.C. § 365, and further, the relationship is a nonassumable personal service contract pursuant to 11 U.S.C. § 365(e)(2)(A). Finally, Shell argues alternatively that the debtor has no equity in the leased premises, no prospects for reorganization, and the franchise relationship is not necessary for an effective reorganization. The debtor's answer contained a counterclaim requesting an order requiring Shell to continue to supply products to Anne Cara and for attorneys' fees because on April 15, 1983, without having obtained relief from the stay, Shell attempted to take possession of the leased premises and discontinued supplying Anne Cara. No answer was filed to the counterclaim.

Under 11 U.S.C. § 541(a), "[t]he commencement of a case ... creates an estate.... [Such] estate is comprised of all legal or equitable interests of the debtor in property, wherever located, as of the commencement of the case." "The scope of this paragraph is broad ..., [however] it is not intended to expand the debtor's rights

---

which authorize termination. See 15 U.S.C. § 2802.

**6.** I cite these figures only to show that this is a very small Chapter 11 case in terms of both dollar amounts and total number of creditors.

**7.** According to the debtors statement of affairs, the business also included a car wash which activities could continue despite the preliminary injunction.

against others more than they exist at the commencement of the case." H.R.Rep. No. 595, 95th Cong. 1st Sess. 367 (1977) and S.Rep. No. 989, 95th cong. 2d Sess. 82 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, 6323. As of the commencement of this Chapter 11 case, the estate contained the franchise relationship which by the terms of the January 12 letter was to terminate the day after the petition was filed.

If the franchise relationship had terminated prior to the filing of the Chapter 11 petition, § 362 would offer no protection to the debtor as it is well settled that the bankruptcy court cannot create an interest for the debtor where none exists. *See, e.g., In re LJP, Inc.* 22 B.R. 556, 558, 9 B.C.D. 853, 854 (Bkrtcy.S.D.Fla.1982) ("no legislative intention to permit assumption or reinstatement of contracts which have expired or have been terminated before bankruptcy"); *In re Volpe Enterprises, Inc.,* 23 B.R. 818, 820 (Bkrtcy.S.D.Fla.1982) ("nothing left for the court to resuscitate or protect"); and *In re Butchman,* 4 B.R. 379, 381, 6 B.C.D. 403, 404 (Bkrtcy.S.D.N.Y.1980) ("[b]ankruptcy [c]ourt cannot . . . cultivate rights where none can grow"). "The Bankruptcy Code generally does not grant the debtor . . . greater rights and powers under a contract than the debtor . . . had outside of bankruptcy". *In re Douglas,* 18 B.R. 813, 815, 8 B.C.D. 1233, 1234 (Bkrtcy.W.D.Tenn. 1982).

Upon the filing of the Chapter 11 petition, the automatic stay went into effect "to [stop] all collection efforts, all harassment, and all foreclosure actions." H.R. Rep. *supra* at 340, U.S.Code Cong. & Admin.News 1978, p. 6297. This would include any actions by Shell to obtain possession of the leasehold premises or to attempt to cancel the franchise relationship. The stay remains in effect as long as the property in question remains part of the estate. Here, Shell did not perform any of the acts forbidden by § 362(a) before the franchise relationship terminated by the terms of the January 12 letter. "Generally, a bankruptcy court may not extend a contract beyond its original terms. The Bankruptcy Code neither enlarges the rights of a debtor un-der a contract, nor prevents the termination of a contract by its own terms." (citations omitted). *In re Advent Corp.,* 24 B.R. 612, 614, 9 B.C.D. 1103, 1104 (Bkrtcy. 1st Cir. 1982). "The general rule is . . . if the [non-debtor] party had a right to terminate the arrangement, that right survives adoption of the contract by the trustee. . . ." *Thompson v. Texas Mexican Railway Co.,* 328 U.S. 134, 141, 66 S.Ct. 937, 942, 90 L.Ed. 1132 (1946). "[T]he right to terminate a contract pursuant to its terms survives the bankruptcy of the other contracting party." *Id* at 142, 66 S.Ct. at 943. *See also In re Schokbeton Industries, Inc.,* 466 F.2d 171 (5th Cir.1972).

■ At the time of the filing of the Chapter 11 petition, the franchise relationship was executory within the meaning of Professor Countryman's authoritative article, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439 (1973). The salient feature is that under 11 U.S.C. § 365 debtors may assume or reject what are executory contracts (with limitations) even over the objection of the non-debtor contracting party. However, one of these limitations is the expiration or termination date. *See In re Nashville White Trucks, Inc.,* 5 B.R. 112 (Bankr.M.D.Tenn.1980). To prevent the relationship from terminating, some affirmative action on the part of the debtor was needed. As of the day after the petition was filed, the franchise agreement ceased to be executory and without some activity by the debtor, could not therefore be assumed. "The [Bankruptcy] Code does not . . . grant the debtor . . . greater rights and powers under the contract than he had outside of bankruptcy. [There is] nothing in the Code which enlarges the rights of [the debtor] under the contract or which prevents the termination of the contract on its own terms . . . ." *In re Nashville White Trucks, Inc., supra* at 117. "[T]he stay created by 11 U.S.C. Section 362 does not operate to toll the mere running of time . . . . [T]he notice . . . having been given prior to the commencement of the Chapter 11 case ran its course unaffected by the stay." *In re Barber-Greene Co.* 17 B.R. 248,

250 (Bkrtcy.D.Minn.1982). "It is well established that the filing of the petition for relief with the Bankruptcy Court in no way gives rise to a right in the ... [d]ebtor in possession to extend the time of the ... [a]greements, which expired by their terms [one month after the filing of the petition]" (citations omitted). *In re Beck,* 5 B.R. 169, 170–171, 6 B.C.D. 1119, 1120 (Bkrtcy.D.Ha. 1980). *See also In re Trigg,* 630 F.2d 1370 (10th Cir.1980); *In re Intermet Realty Partnership,* 26 B.R. 383 (Bkrtcy.E.D.Pa.1983); *In re New Media Irjax, Inc.,* 19 B.R. 199 (Bkrtcy.M.D.Fla.1982); and *In re Benrus Watch Co., Inc.,* 13 B.R. 331, 7 B.C.D. 1408 (Bkrtcy.S.D.N.Y.1981). *Cf. In re R.S. Pinellas Motel Partnership,* 1 C.B.C.2d 349 (Bkrtcy.M.D.Fla.1979).

■ 11 U.S.C. § 108(b) is of no help to the debtor for it only extends the time period for curing a default if "applicable law, or order entered in a proceeding, or an agreement fixes a time period within which the debtor may do" same. No such agreement, order or law exists here. Furthermore, the Court in *In re McLouth Steel Corp.,* 20 B.R. 688 (Bkrtcy.E.D.Mich.1982), held that since § 365 is more specific than § 108, when dealing with an executory contract, the provisions of § 365 apply. Since the franchise relationship, by the terms of the January letter, terminated the day after the petition was filed, and the debtor made no attempt to assume the relationship within that time, there was nothing left for the debtor to assume under § 365 after April 15, 1983. "[E]ven though § 365(b) of the Code provides for the assumption of executory contracts, it cannot come into play in a situation where, as here, there is nothing left to assume." *In re Fontaine Janitorial Supply Service, Inc.,* 17 B.R. 322 (Bkrtcy.M.D.Fla.1982). "[F]or there to be a right to cure there must still be a contract or lease in existence, that is, the contract or lease may not be one which has already expired according to its terms or has been terminated pre-bankruptcy." Collier on Bankruptcy ¶ 365.04[1] (15th ed. 1982). *See also In re Varisco,* 16 B.R. 634, 8 B.C.D. 772 (Bkrtcy.M.D.Fla.1981). It may be argued that the March letter created a new ninety-

day termination period which gave the debtor until June 15 to assume the relationship. This, however, may be easily dismissed. The plain fact is that the Court cannot ignore the terms of the January letter when the debtor made no attempt to satisfy the default by payment of amounts due as required by § 365. The franchise relationship terminated, as a result of a nonbankruptcy default which was not cured within the applicable time period, the day after the filing of the Chapter 11 petition. Furthermore, it is likely that the commingling of products, set forth as conditional grounds for termination in the March letter, is the type of incurable default recognized by Asa Herzog and Lawrence King in 4 *Collier on Bankruptcy Guide* ¶ 68.06[9] (1982) which renders the relationship nonassumable under § 365. As stated in *Good Hope Refineries, Inc. v. Benavides,* "[i]f the debtor has committed ... an incurable breach, the [debtor] has no continuing rights under the contract." 602 F.2d 998, 1003 (1st Cir.) *cert. den'd,* 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979). By the lack of remedial provisions in the PMPA it is possible that there is no way other than termination, to remedy a commingling violation.