Timothy C. SAWYER, Plaintiff,

v.

BP OIL, INC., Defendant.

Civ. A. No. 85-2944.

United States District Court, District of Columbia.

Oct. 7, 1985.

William R. Scanlin, Anderson, Quinn, Wyland, Yost & Scanlin, Washington, D.C., for plaintiff.

Jeffrey A. Dunn, Gary M. Hnath, Venable, Baetjer, Howard & Civiletti, Washington, D.C., for defendant.

## MEMORANDUM ORDER

HAROLD H. GREENE, District Judge.

Plaintiff Timothy Sawyer brought this action seeking injunctive and declaratory relief against the defendant, BP Oil, Inc., pursuant to the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 *et seq.* The general issue before the Court is whether defendant BP Oil fully complied with the requirements of the PMPA when it failed to renew plaintiff's franchise. More specifically, this case presents the question of whether a prior notice of termination is invalidated by a promise by a franchisor to allow a franchisee to continue to operate a service station while negotiations for sale of the lease are ongoing between them.

## I

On May 3, 1982, plaintiff and defendant entered into a Dealer License Agreement, authorizing plaintiff to operate a gasoline service station at 1448 U Street as a franchised BP dealer.[1] The Agreement provided that the franchise would expire on May 31, 1985.

On May 29, 1985, defendant notified plaintiff by certified mail of its decision not to renew the Agreement because the company had decided to close and sell its interest in the U Street gas station.[2] The notice informed plaintiff that his franchise would terminate on August 31, 1985.[3]

Approximately one month later, on July 1, 1985, BP Oil sent a letter to plaintiff offering to sell him its interest in the U Street property for $375,000.[4] The letter gave plaintiff 60 days to accept the offer and execute a formal agreement.[5] On August 21, 1985, almost six weeks later and a little over a week before the August 31 franchise expiration date, plaintiff responded to BP Oil's offer with a $200,000 counteroffer which BP Oil promptly rejected by a letter dated August 28. The letter also notified plaintiff that the expiration of his franchise would become effective on August 31, 1985, pursuant to BP's May 29 notice of intent not to renew, and that BP Oil intended to close the U Street gas station on September 20, 1985.[6]

In the only disputed fact in this case, plaintiff claims that during the course of the negotiations for BP's interest in the leasehold, the company agreed to extend the dealer licensing agreement indefinitely. Defendant denies that it agreed to any such extension, acknowledging, however, that it informed plaintiff's attorney that it would not close the station until the conclusion of the negotiations in the event that they extended past August 31.

On September 18, 1985, two days before defendant was scheduled to close the U Street station, plaintiff filed this action, seeking a temporary restraining order and a preliminary injunction against such closure. Following an agreement by the parties to maintain the status quo pending a decision on the case, the Court agreed to disregard the request for a temporary restraining order and to decide the case as a motion for preliminary injunction.

## II

As indicated, plaintiff brings this action pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* Section 2805(b)(2) of Title 15 provides that, in actions brought by franchisees alleging violations of the Act:

> ... the court shall grant a preliminary injunction if
>
> (A) the franchisee shows

**1.** BP Oil is holding the U Street property on a long term lease. See Mui Affidavit, p. 2 and Exhibit 2.

**2.** The letter explained that BP's decision was based upon its location in a high-crime district and its proximity to Maryland with its lower gasoline taxes. See Morris Affidavit, Exhibit B.

**3.** The notice of intent not to renew was sent pursuant to a provision of the PMPA, 15 U.S.C. § 2804(a), which requires a franchiser to give franchisees at least 90 days notice before terminating a franchising agreement, along with a statement of reasons for the termination.

**4.** BP's offer was in compliance with section 28-02(b)(3)(D)(iii)(I) of the PMPA, *infra* note 9. This provision requires all franchisors electing not to renew franchise agreements because they intend to sell their interest in the franchise to

make a bona fide offer to sell the property first to the franchisee.

**5.** The expiration of the 60 days, which would have occurred on or around August 30, roughly coincided with the effective date for the termination of the franchise on August 31.

**6.** Plaintiff also operates another one of defendant's stations, located on New Hampshire Avenue, N.W. When defendant notified plaintiff of its intent to sell the U Street station, and terminate his franchise, it likewise notified him of its intent to sell the New Hampshire Avenue station and terminate his franchise there as well. BP also offered to sell its interest in the New Hampshire station to plaintiff at the beginning of July. Plaintiff and defendant reached an agreement on a purchase price in mid-August, and plaintiff will presumably continue to operate the BP New Hampshire Avenue station.

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed; and

(ii) there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

With this standard at hand, the Court turns to an examination of the substantive statutory provisions at issue here and an analysis of the plaintiff's claims in light of those provisions.

The PMPA was enacted to equalize to a degree the disparity in bargaining power between large petroleum companies and individual service station operators in the negotiation and maintenance of franchising agreements. See S.Rep. No. 95–731, 95th Cong., 2d Sess. 17–18, U.S.Code Cong. & Admin.News 1978, pp. 873, 875–877; 123 Cong.Rec. 10383, 10387 (1977). In striking a balance between the conflicting interests of franchisers and franchisees, Congress sought to protect franchisees from arbitrary and discriminatory termination of their franchises while allowing franchisors to effect legitimately terminations of franchises based upon changed conditions or a failure of the franchisee to carry out his contractual obligations. S.Rep. No. 95–731, 95th Cong., 2d Sess. 19.

To implement this balance, the PMPA places a number of restrictions on the ability of franchisors to terminate or fail to renew a franchise, imposing both substantive and procedural safeguards for the protection of franchisees.[7] The franchisor may terminate a franchise only through strict compliance with the PMPA requirements. See *Escobar v. Mobile Oil Corp.*, 678 F.2d 398, 400 (2d Cir.1982).[8]

Thus, in order effectively to terminate its franchise with plaintiff in compliance with the PMPA, BP first had to terminate or to fail to renew the franchising agreement on one of the grounds enumerated in the statute. Next, BP had to notify plaintiff in a specified manner of its intent to terminate or to fail to renew the franchise at least 90 days before the date the termination or nonrenewal becomes effective. Finally, where, as here, the grounds for termination or nonrenewal was the franchisor's intent to sell its interest in the franchise, it had to make a bona fide offer to sell its interest to plaintiff within the 90 day notice period.[9]

The heart of the plaintiff's claim is that BP Oil failed to comply with the notice requirement of the Act. BP did issue a 90 day notice of intent to terminate, as required by section 2804, in the letter BP sent to plaintiff on May 29, informing him of its intent to terminate his lease as of August 31. However, according to plain-

---

7. For example, the Act limits both the grounds on which a termination or nonrenewal may be accomplished, and it establishes a strict notice requirement which must be complied with before a franchisor can effect a termination. See 15 U.S.C. § 2802 *et seq.*

8. As a further protection for the franchisee, the PMPA places the burden of proving compliance with the statute on the franchisor. 15 U.S.C. § 2805(c); see *Lasko v. Consumers Petroleum of Connecticut, Inc.,* 547 F.Supp. 211, 221–22 (D.Conn.1981).

9. Section 2802(b)(3)(D)(iii)(I) provides:
   (3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

\*    \*    \*    \*    \*    \*

   (D) In the case of any franchise entered into prior to June 19, 1978 (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if—
   (i) such determination is—
   (I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel, . . .

tiff, that notice was voided when the company allegedly promised to extend the franchise indefinitely during the course of the negotiations for the sale of the U Street property. Consequently, plaintiff argues, he is entitled to a second 90 day notice before BP may terminate his franchise.

Plaintiff does not claim that the notice BP issued was defective in any other way,[10] and he does not dispute BP's compliance with all of the Act's other prerequisites, such as that there were proper grounds for the termination.[11]  See 15 U.S.C. § 2802. There is every indication the materials submitted to the Court, in fact, that defendant has complied in full with every requirement the Act imposes upon a franchisor to accomplish a proper termination. Thus, unless the plaintiff is able to establish that the negotiations between the parties for the sale of the leasehold and BP's alleged agreement to extend the franchise *did* in fact void the May 29 notice, BP is clearly entitled to terminate the franchise and to close the service station. See *Escobar v. Mobile Oil Corp.*, 678 F.2d 398, 400 (2d Cir.1982).

At the center of this legal issue is the factual question of whether any new agreement was ever made and, if it did, what kind of agreement was made. Plaintiff claims that during the course of the negotiations for the sale of the U Street lease, BP assured plaintiff's representative in the negotiations, James Trimm, that BP would extend plaintiff's franchise "indefinitely." As support for this assertion, he provides only his own affidavit, *although he was not present when BP representatives allegedly made this promise.*[12]

BP, Inc., denies ever agreeing to extend the franchise indefinitely, claiming that its intent has always been to leave the franchising business at the U Street site and to sell its interest in the property. Defendant does acknowledge that it promised plaintiff's attorney, James Trimm, that BP would not close the station until the conclusion of the negotiations between plaintiff and defendant, in the event the negotiations continued past the August 31 closing date, and it offers the affidavits of the two BP officials who actually negotiated with plaintiff's attorney in support of the more limited promise.

Even ignoring the technical evidentiary problems of plaintiff's affidavit,[13] the great weight of the evidence submitted to the Court clearly points to the conclusion that, while there was some agreement, it was only an agreement not to close the station pending negotiations. This conclusion is supported not only by the sworn statements of the two individuals directly involved in the negotiations, but also circumstantially, by defendant's negotiations both with plaintiff and with other parties to sell the property.[14] Given this purpose to sell, it is highly improbable that BP would have agreed to continue the franchise at all, much less indefinitely. On the other hand, given the proximity of the negotiations to the August 31 expiration date, it is probable that plaintiff and defendant made provision only as to what would happen to the U Street station should the negotiations continue past the termination date.

### III

On this basis, the Court finds that the parties agreed merely not to close the sta-

---

**10.**  The Act also requires the notice to contain a statement of reasons for the nonrenewal and that it be given in a specified manner. See section 2804(a)-(c). BP apparently complied with the notice provision in all these respects.

**11.**  BP's stated reason for termination to close and sell the station because of its location, see *supra* note 2, appears on its face to be a permissible ground for nonrenewal pursuant to 15 U.S.C. § 2802(b)(3)(D). See *supra* note 9.

**12.**  Defendant has moved to strike this portion of plaintiff's affidavit as inadmissible hearsay. If

the Court completely disregarded the affidavit on this ground, it would have to dismiss the lawsuit without further consideration. Because of the Court's resolution of the factual dispute about the agreement, it will not rule on the defendant's motion and will assume for present purposes that the affidavit is admissible.

**13.**  See *supra* note 12.

**14.**  BP claims that it is currently involved in negotiations for the sale of its leasehold interest with third parties, including but not limited to McDonald's Corporation. Mui Affidavit, at 6.

tion pending negotiations. What needs to be resolved next is the issue as to whether such an agreement invalidates the otherwise effective notice of termination BP issued on May 29. The PMPA clearly grants franchisees the right to a 90 day notice period, subject to a franchisor's right to a shorter period under certain circumstances.[15] 15 U.S.C. § 2804(a); *Pugh v. Mobile Oil Corp.*, 533 F.Supp. 169, 175–65 (S.D. Tex.1982). In giving the franchise a 90 day notice period, the PMPA grants to the franchisee time to preserve the franchise or to wind up his affairs. See *California Petroleum District v. Chevron U.S.A., Inc.*, 589 F.Supp. 282, 285 (E.D.N.Y.1984). The Act is silent, however, on the question whether a valid notice can subsequently become invalidated by circumstances such as those presented by this case.

Plaintiff supports his claim that BP's prior notice is invalid by citing *Ferriola v. Gulf Oil Corp.*, 496 F.Supp. 158 (E.D.Pa. 1980). In that case, the court held that, where a franchisor and franchisee enter into negotiations for renewal of a franchise after the franchise has expired and then reach an impasse in negotiations, the franchisee is entitled to a 90 day notice before the franchise may be terminated. But *Ferriola* is no help to plaintiff here simply because the franchisor in that case *had never given the franchisee any valid notice of intent to terminate.* In fact, the franchisor there clearly intended to continue the franchise but was unable to reach an agreement on the conditions of renewal with the franchisee. Consequently, the franchisee had not yet had the benefit of a 90 day period to wind up his affairs or to try and preserve the franchise through some other method. Here, plaintiff had

the benefit of a valid 90 day notice period and knew all along that BP intended to sell the station.

■ Not only does there not appear to be any other precedential support for the proposition that a deferral of a closing date pending negotiations invalidates prior valid notice, but the statute, in fact, clearly contemplates in section 2802(b)(3)(D)(iii)(I)[16] that negotiations such as those which took place here—*i.e.*, negotiations for the sale of the property—will occur during the 90 day notice period and that they do not invalidate the notice. The Act nowhere provides or implies that such negotiations or an agreement to suspend closure pending negotiations would in any way invalidate the notice period. Indeed, an invalidation consequence would defeat the very purpose of the bona fide offer provision because it would discourage franchisors from negotiating actively to sell their interests or, at the least, it would discourage negotiations beyond the 90 day period. This type of disincentive would, of course, interfere with the ability of franchisees to buy franchises.

It is relevant also that, while the broader purpose of the Act is to protect franchisees from arbitrary and discriminatory termination, BP's actions in this case have not been of such character. Plaintiff does not challenge defendant's reasons for terminating the franchise or the bona fide quality of its offer to sell the station for $325,000. In addition, while the Court recognizes the disadvantaged position a small service station operator such as plaintiff vis-a-vis a large corporation such as BP Oil, the PMPA is designed to rectify that disadvantage and restore a fairer balance between the two parties.[17] But under the balance

---

**15.** Although not relevant to this case, 15 U.S.C. § 2804(b)(1) does provide an exception to the 90 day notice requirement for "circumstances in which it would not be reasonable for the franchisor to furnish notification" 90 days in advance.

**16.** See note 4, *supra*.

**17.** The legislative history of the Act establishes that Congress did *not* intend to provide the

maximum protection possible to franchisees without regard to the legitimate interests of franchisors. In the committee report, the Senate Committee members wrote:

Legislation in this subject area requires recognition of the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain changes in cir-

struck by the Act, the franchisor has a right *not* to renew a franchise if it complies with the requirements of the Act in so doing. See *Roberts v. Amoco Oil Co.*, 740 F.2d 602, 606 (8th Cir.1984); *Bellmore v. Mobile Oil Corp.*, 524 F.Supp. 850 (D.Conn. 1981).

It follows from what has been said that even under the relaxed standard for issuing injunctive relief pursuant to section 2805(b)(2) of the PMPA,[18] the Court must deny plaintiff's motion.

### IV

■ Plaintiff has not shown the existence of a sufficiently serious question going to the merits so as to provide a fair ground for litigation. Furthermore, although it is undisputed that the plaintiff's franchise has not been renewed, thereby satisfying the first requirement for relief, it is not even clear that plaintiff could prevail on the third requirement, balance of hardships, even if the Court did find a sufficient question on the merits. Plaintiff's successful purchase of the Rhode Island Avenue station establishes that his operation of the U Street station is not his sole livelihood.[19] See *Cantrell v. Exxon Co., U.S.A.*, 574 F.Supp. 313 (M.D.Tex. 1983). In the meantime, the defendant would bear the daily operating loss of the station during an additional 90 day notice period, and more importantly, would be hampered in its current effort to sell the leasehold interest to a third party. If plaintiff had been able to establish, or even to adduce credible evidence, that he had some hopeful prospect of negotiating the sale with BP during any additional notice period, the result might conceivably be different. In the absence of such evidence, any additional notice period creates no more than pointless delay and unnecessary expense to the defendant.

For the reasons stated above, it is this 7th day of October, 1985

ORDERED that plaintiff's request for a preliminary injunction be and it is hereby denied; and it is further

ORDERED that this action be and it is hereby dismissed.

cumstances. Particularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.

S.Rep. No. 95–731, 95th Cong., 2d Sess., at 19; see also, 123 Cong.Rec. 10383, 95th Cong., 2d Sess.

